478 So.2d 1281 (1985)
John S. NEUMEYER, Individually and on Behalf of His Minor Son, John S. Neumeyer, and Mrs. John S. Neumeyer, Individually and on Behalf of Her Minor Son, John S. Neumeyer, Jr.
v.
William C. TERRAL, M.D., Terral's Children's Clinic, A Professional Medical Corp., Clemente Mendoza, M.D., Bertha N. Wexler, M.D., and Eli Lilly & Company.
No. 85-CA-280.
Court of Appeal of Louisiana, Fifth Circuit.
November 12, 1985.
Writ Denied January 24, 1986.
*1283 Wayne M. Richardson-Harp, B.R. Malbrough, Frederick J. Gisevius, Jr., New Orleans, for plaintiffs-appellants.
W.K. Christovich, Terry Christovich Gay, Christovich & Kearney, Edward J. Rice, Jr., Adams and Reese, William S. Penick, Deborah I. Schroeder, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, for defendants-appellees.
Before KLIEBERT, CURRAULT and DUFRESNE, JJ.
KLIEBERT, Judge.
This is a devolutive appeal by John S. Neumeyer, individually and on behalf of his minor son, John S. Neumeyer, Jr., and Mrs. John S. Neumeyer, individually and on behalf of her minor son, John S. Neumeyer, Jr., from a judgment, based on a jury verdict, dismissing their suit for medical malpractice against defendants, William C. Terral, M.D.; Terral's Children's Clinic, a Professional Medical Corporation; Clemente Mendoza, M.D., and Bertha Wexler, M.D. The defendants did not appeal or answer the appeal. We affirm.
Plaintiffs originally included Eli Lilly & Company in the suit as a co-defendant; however, in the third week of trial, a consent judgment was entered into voluntarily dismissing Eli Lilly from the suit with prejudice. The jury received no explanation as to why the dismissal occurred. The case proceeded against the physicians-defendants and was tried over a period of some seven weeks.
The child was born healthy and by a normal delivery on January 22, 1974. The defendant, Dr. William Terral, was the minor child's treating pediatrician from his birth to December 31, 1974. When the child was one month old, Dr. Terral prescribed Keflex, an antibiotic, for a respiratory infection. According to the child's mother, Keflex caused the child to develop a rash and diarrhea. She contends that upon the advice of Dr. Terral (who she says considered the rash and diarrhea to be an allergic reaction to Keflex) the administration of Keflex was terminated and the diarrhea resolved itself. The reaction incident was not reflected in the doctor's records. The mother, however, testified and was supported by the testimony of a friend, that she specifically asked the doctor to reflect the incident in his records. The doctor denied any recollection of the reaction or of the mother's request.
When the child was approximately ten months of age (early December 1974) Dr. Terral again treated him for a respiratory infection and prescribed Keflex which caused the child to develop a rash and diarrhea. The mother brought the child to Dr. Terral's office and was told to discontinue the administration of Keflex. Notwithstanding several visits to the doctor's office, the diarrhea was not resolved. Hence, on December 6, 1974 the child was admitted to Southern Baptist Hospital with a diagnosis of acute gastroenteritis and a history of fever, vomiting, diarrhea and moderate dehydration. The child responded to the treatment (a soft diet, intravenous injection of fluids & medicines for pathogenic E. coli) and was discharged on December 9, 1974. According to the mother, continuing diarrhea caused her to make repeated visits to Dr. Terral's office following the child's discharge from the hospital.
On at least three occasions during the time the child was under the care of Dr. Terral (in the office and in the hospital) he was seen by Dr. Mendoza, a pediatrician who was associated with Dr. Terral and took his calls at specified times.
By the end of December 1974 Mrs. Neumeyer became dissatisfied with Dr. Terral's treatment of the child and made arrangements for an office visit with Dr. Bertha Wexler, a pediatrician, on January 3, 1975. On this first visit, Dr. Wexler noted in her records the mother's report of the child's allergic sensitivity to Keflex. From January 1975 to the spring of 1976, a period of about one and one-half years, Dr. Wexler *1284 treated the child for allergies and for what she subsequently testified to be loose bowels (as distinguished by her from diarrhea[1]) which she attributed to irritable bowel syndrome unrelated to antibiotic reaction. During the time the child was under her treatment, she prescribed several antibiotics, excluding Keflex but including Bicillin, Ampicillin, Lincocin, and Furoxone, which were administered orally or by injection. In the latter part of Dr. Wexler's treatment period, unknown to Dr. Wexler, the child also received treatments which included antibiotics from Dr. Emile Bertucci. Throughout the treatment period and up to the time of trial the child continued to gain weight and had normal growth as measured by generally accepted standard weight and growth charts used by pediatricians.
In the spring of 1976 Mrs. Neumeyer, on her own initiative, brought the child to John Hopkins Hospital and subsequently to the Mayo Clinic, both out-of-state medical institutions, for examination and treatment. Both institutions issued reports stating the cause of the child's loose stools or diarrhea was antibiotic abuse or antibiotic overuse.
In their petition, plaintiffs alleged that as a result of the named physicians' individual or combined failure to administer the proper treatment and/or the individual or combined negligent administering of treatment and/or the excessive administering of medicines the child sustained permanent and disabling brain injuries causing seizures and a learning disorder. The plaintiffs' basis for recovery is predicated on the contention that the administration of Keflex and/or other antibiotics caused diarrhea which led to dehydration, thus raising the level of sodium in the blood which ultimately resulted in and caused brain damage. In support of their position, they introduced the testimony of expert witnesses, in person, by deposition or by video tape, namely: Dr. John Atwater, pediatrician; Dr. F.L. Yan-Go, pediatrician; Dr. Shi-Shung Huang, pediatrician; Dr. Michael Ritota, internist; Dr. Kenneth Vogel, neurosurgeon; Dr. Joshua Carey, neurologist; Dr. David Clark, clinical psychologist; Dr. Joyce Adema, optometrist, and Dr. Victor Thorne, clinical psychologist; all physicians practicing outside of the New Orleans area, except for Drs. Vogel and Thorne.
In defense, Dr. Terral did not dispute plaintiffs' contention that he prescribed Keflex and/or that one of the results of an allergy to Keflex is diarrhea. Contrary to the mother's testimony, however, he contends he had no knowledge of the child's original reaction to Keflex and that the diarrhea which caused the admission into Southern Baptist Hospital was cured when Dr. Wexler commenced treating the child.
The defense common to all defendants is grounded in the contention that for the child to have been sufficiently dehydrated to result in brain damage, the child would have to have been in a semi-comatose or comatose state and have to have sustained severe diarrhea which would have been evidenced by substantial weight loss. Since the child had normal growth and weight gain, the defendants contend the child does not have brain damage, never had seizures and merely has a developmental learning disorder totally unrelated to the treatment administered by the defendants. In support of their contentions the defendants submitted the testimony of Dr. Andrea Starett, an expert in developmental pediatrics; Dr. Carmella Tardo, pediatric neurologist; Dr. Steven Pfeiffer, child clinical psychologist, and Mrs. Rhoda Kelly, speech pathologist, as well as the expert testimony of Dr. Richard Levy, neurosurgeon; Dr. R. Alma Gates, pediatrician with a specialty in pulmonary disease, and Dr. Richard Bagnetto, general pediatrics.
To counter-defendants' contentions, plaintiffs sought to show a ten percent weight loss immediately prior to admission at Baptist Hospital by comparing the mother's statement as to the child's weight a few days prior to admission and the weight recorded at the hospital.
*1285 The case was submitted to the jury on interrogatories which asked whether each defendant was negligent and, if so, was such negligence the proximate cause of "any injuries sustained by John S. Neumeyer, Jr." In Response to the interrogatories, the jury found Dr. Wexler and Dr. Mendoza were not negligent. Although it found Dr. Terral was negligent, it concluded his negligence was not the cause in fact of "any injuries sustained by John S. Neumeyer, Jr."
On appeal the plaintiffs do not complain of the way in which the jury was charged by the trial judge. Rather, their counsel asks that we review their five assignments of error in the light of the facts and law and settle upon one of the following courses:
(1) render a judgment notwithstanding the verdict;
(2) reverse the trial court's judgment because of the trial errors and remand for a new trial;
(3) reverse the judgment for the defendants, find for the plaintiffs and assess the amount of damages.
Under the standard of review initiated by the state supreme court in Canter v. Koehring, 283 So.2d 716 (La.1973) and Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978), we should not disturb the findings of the trier of facts unless it is shown that their factual conclusions are clearly or manifestly erroneous. Where there is evidence before the trier of facts which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's findings, we are not at liberty to substitute our own evaluation of the evidence for those of the trier of the facts. Canter v. Koehring, supra; Arceneaux v. Domingue, supra.
Apparently, recognizing the limitations on our review of the facts the plaintiffs assign four procedural rulings by the trial judge as error and contends either one warrants reversal of the jury's verdict. These are: (1) allowing, over plaintiffs' counsel's objection, Dr. Gates to comment on conversations between herself and Dr. Iannaconnie, who was not called as a witness, (2) allowing defendant's, Dr. Terral's counsel to cross-examine the co-defendants, Drs. Mendoza and Wexler, immediately following the plaintiffs' cross-examination of these defendants as part of his case-inchief, (3) improperly limiting the questions or the field in which Dr. Vogel, Dr. Atwater and Dr. Ritota could testify as expert witnesses, and (4) allowing, over plaintiffs' objection, and after defendants' failure to disclose the existence of their reports, the testimony of experts from Ochsner's Developmental Center. The "meat of the coconut" however is assignment of factual error by the jury, i.e., the jury erred in failing to find the defendant doctors' treatments were not up to the community standard of treatment and was the cause in fact of the child's brain damage and resulting seizures.
In reaching a decision on the alleged procedural errors, we have to consider (1) Was the particular ruling complained of in error and, if so, (2) Did the error harm or prejudice the plaintiffs' cause, for unless it does, reversal is not warranted. Commercial Bank & Trust Co. v. Marks, 441 So.2d 369 (5th Cir.1983); Naquin v. Maryland Cas. Co., 311 So.2d 48 (3rd Cir.1975); Lauro v. Travelers Insurance Co., 261 So.2d 261 (4th Cir.1972). Further the party alleging error has the burden of showing the error was prejudicial to his case. In other words, the determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case. Courtney v. Winn-Dixie Louisiana, Inc., 447 So.2d 504 (5th Cir.1984); Parker v. South La. Contractors, Inc., 370 So.2d 1310 (1st Cir.1979).
Under these standards and principles of review, we consider the assignments of error urged by the plaintiffs in the same order argued by the plaintiffs' counsel in his brief.

ASSIGNMENT OF ERROR NO. 1
Plaintiffs assign error to the trial court's admission of the statement of Dr. Gates (who counsel argues had not seen or attended the child) concerning her out-ofcourt conversations with Dr. Iannoconnie, *1286 another physician who had seen and treated the child but made no appearance in the case. Plaintiffs contend the statements were inadmissible hearsay which prejudiced their case because it presented to the jury a strong suggestion that one of the treating physicians doubted the seizure history of the child which deprived the plaintiffs of an opportunity to cross-examine the doctor whose views had been expressed by a doctor who had not attended or examined the child, thus bootstrapping the view into more than it actually was. The part of Dr. Gates' testimony which is relevant to plaintiffs' contention was as follows:
"THE WITNESS:
Yes, she [Dr. Iannaconnie] was still here in town. This was a face to face conversation. And she said that she was not comfortable with the history at that point as to it being absolutely a seizure or absolutely not a seizure but felt that even though the EEG was normal that it was worthwhile to consider that this might be a seizure and give him a trial medication to see if this would improve and she explained to me that it was not an uncommon thing that they have to do in these circumstances where you have this type of history in a patient with a normal EEG." (Emphasis Supplied)
Dr. Gates, a pediatrician with a subspecialty in pediatric pulmonary disease, was called in consultation by Dr. Iannaconnie because of the child's history of respiratory and gastrointestinal problems. In connection with this consultation, according to the record, Dr. Gates (contrary to the facts recited by counsel to support plaintiffs' argument) did take a medical history and conducted a full and thorough physical examination and thus was intimately involved in the child's care.
Unlike State v. Chalaire, 251 La. 984, 207 So.2d 767 (1968) urged by the plaintiffs, here Doctor Gates was not asked whether she agreed or disagreed with Dr. Iannaconnie's opinion. Thus, the statement complained of was not offered as an assertion of the truth of the statement but rather as part of the basis for the formation of her own expert opinion that the child did not have a seizure disorder. In State v. Fallon, 290 So.2d 273 (La.1974), the Louisiana Supreme Court said "[the] character of the evidence upon which an expert bases his opinion affects the weight it is accorded and has no bearing on its admissibility."
In response to the objection to its admissibility the trial judge stated he would permit the admission of the conversation for having permitted plaintiffs' expert, Dr. Vogel, to testify as to telephone reports he received from other experts as a matter of fairness and consistency he should admit it. Thus, viewed in the light of the totality of the evidence in the record and the inconclusive nature of the statement, we fail to see how this statement could have a bearing on the jury's ultimate conclusion. See Lauro v. Travelers Insurance Company, supra. Therefore, we cannot say the trial judge erred in admitting the testimony or that its admission harmed or prejudiced the plaintiffs' case.

ASSIGNMENT OF ERROR NO. 2
Under this assignment plaintiffs contend the trial judge erred in allowing, over plaintiffs' objection, counsel for Dr. Terral to cross-examine his co-defendants, Drs. Mendoza and Wexler immediately after plaintiffs' counsel had cross-examined them as part of their case-in-chief pursuant to the provisions of Code of Civil Procedure Article 1634. Thus, the assignment raises two issues(1) the order or time at which the examination was allowed, and (2) the right to cross-examine as opposed to a direct examination.
The record shows that prior to allowing the cross-examination of Drs. Wexler and Mendoza, the judge entertained arguments of all counsel outside the presence of the jury. Then, relying on Montgomery v. City of New Orleans, 266 So.2d 482 (4th Cir.1972), writ refused, 263 La. 370, 268 So.2d 258 (1972), concluded that in order to present a more efficient case to the jury it would be better to permit consecutive examination of the two doctors by the plaintiffs and the co-defendant, Dr. Terral.
*1287 Code of Civil Procedure Article 1634, since its amendment in 1970, provides in part as follows:
"Any party or his representative may be called as a witness and cross-examined by the adverse party without the latter vouching for his credibility, or being precluded from impeaching his testimony, and immediately thereafter the witness thus called may be examined or crossexamined to the extent otherwise permitted by law upon the subject matter of his examination in chief by such adverse party. The court may permit the recall and further cross-examination of the party or of his representative as often as it deems such action to be in the interest of justice. Emphasis Supplied"
* * * * * *
A large portion of plaintiffs' brief is dedicated to an alleged laundry list of testimony elicited from Dr. Mendoza and Dr. Wexler during plaintiffs' case-in-chief which he argues was prejudicial to his case because it permitted the defendants examination to be repeated and emphasized to the jury. We do not agree.
As shown by the above emphasized language of Article 1634 the article clearly permits an adverse party to examine or cross-examine a witness immediately following his cross-examination under the statute. Further, the court may permit recalls of such a witness when "it deems such action to be in the interest of justice." Moreover, Code of Civil Procedure Article 1632, which sets the Order of Trial, (plaintiffs' case succeeded by defendants' case) allows the trial judge to vary the prescribed order of trial "when circumstances so justify." Considering the length of the trial, the number of expert medical witnesses, and the complexity of the issues, we cannot say the trial judge abused his authority in permitting an examination of Drs. Mendoza and Wexler immediately following their cross-examination by plaintiffs' counsel. To the contrary, under the circumstances involved here, we believe, as did the trial judge, that the better interest of the litigants, including the plaintiffs, required the two examinations (the plaintiffs and the co-defendants) follow one another for it would permit a better evaluation of the testimony by the jury.
Having reached the conclusion there was no error as to the order or time at which the examination was conducted, we next consider whether the trial judge erred in permitting the examination to be conducted as a cross-examination as opposed to a direct examination.
We agree with plaintiffs' contention that as a rule unless the parties are adverse to one another, code of Civil Procedure Article 1634 does not permit the cross-examination of a defendant by his co-defendant.[2] See Giraud v. Clark, 354 So.2d 752 (4th Cir.1978); Hancock v. Safeco Insurance Co., 368 So.2d 1162 (3rd Cir.1979). Finding error, however, is not sufficient to require a reversal. For us to reverse, the plaintiffs must also show the error was prejudicial or harmful to the plaintiffs' case.
We have reviewed all of the testimony of Drs. Mendoza and Wexler and conclude that in the final analysis it made no difference whether the examination was permitted as a cross-examination as opposed to a direct examination. In substance and in form the questions asked in the examination were no different from those which would have been permissible in a direct examination. Further, we note the testimony did little to absolve Dr. Terral of negligence for in fact the jury found him to be negligent.
The plaintiffs' arguments as to alleged laundry list of prejudicial testimony is not directed so much as to how it was elicited, as it is, to the time or order in which it was elicited. The plaintiffs have not pointed out nor did we, in our review, find any testimony that could not have been elicited on a direct examination or any substantial differentiation in the examination actually *1288 conducted from that of a direct examination. Moreover, the testimony in this area (the trial judge limited the scope of the examination to that inquired into by the plaintiffs) tracks that given by the doctors in their own defense.
Therefore, since: (1) the trial judge was authorized to permit the examination of the co-defendants, Drs. Mendoza and Wexler, immediately following their cross-examination by plaintiffs' counsel, (2) the defendant, Dr. Terral, had a right to call these doctors for direct examination, (3) the form and substance of the questions asked were no different from that which could have been elicited on a direct examination, and (4) the jury did not absolve Dr. Terral of negligence, we cannot say the trial judge's error in allowing the examination to be conducted as a cross-examination (as opposed to a direct examination) was prejudicial to plaintiffs' case or had any substantial bearing on the jury's verdict. Hence the error was not reversible error.

ASSIGNMENT OF ERROR NO. 3
Here the plaintiffs argue that the trial court erred to their prejudice in failing to allow their medical experts, Dr. Vogel, Dr. Atwater and Dr. Ritota, to respond to particular questions or to qualify as experts in a particular subspecialty.
The general rule as to qualification of experts and the allowance of their expert opinion in evidence was set out by Judge (subsequently Justice) Tate in Carvell v. Winn, 154 So.2d 788 (3rd Cir.1963) at page 791, and subsequently quoted in Jennings v. Allstate Insurance Company, 273 So.2d 534 (1st Cir.1973) at page 536, and in Succession of Armshaw, et al v. Succession of Marbury, et al, 428 So.2d 1180 (5th Cir. 1983) at page 1182, as follows:
"As previously stated herein, whether or not a witness meets the qualifications to testify as an expert is largely within the discretion of the trial judge. In our opinion, it is also largely within the discretion of the trial judge to determine the competency of expert witnesses to testify to specialized areas on inquiry not necessarily within his general competency to give an opinion as an expert, or at least not shown to be so by the facts of the record. That is, the trial court is not under a mandatory duty to permit an expert witness to testify to any matter upon which the expert himself says he is qualified to give an expert opinion; the court must have some discretion to limit the witness's testimony as an expert to the actual field of his expertise and as applicable to the facts of the particular litigation, then before it (subject of course to a showing that the court abused its discretion in this regard, State v. Carter, 217 La. 547, 46 So.2d 897.)
"Thus referring to the ability of a witness to testify as an expert based upon his `experiential capacity', Dean Wigmore noted that `The capacity is in every case a relative one, i.e., relative to the topic about which the person is asked to make the statement * * *. His fitness, then, is a fitness to answer on that point. He may be fitted to answer about countless other matters, but that does not justify accepting his views in the matter in hand.' 2 Wigmore on Evidence (3rd ed., 1940), Section 555(1) at p. 634. `In most jurisdictions it is repeatedly declared that the decision upon the experiential qualifications of witnesses should be left to the determination of the trial court', referring to `the fact of the possession of the required qualification by a particular witness.' Ibid, Section 561, p. 641. Cf. LSA-R.S. 15:466; State v. Mills, 229 La. 758, 86 So.2d 895 (syllabus 8)."
As to Dr. Atwater, the plaintiffs argue the trial judge refused to qualify him in the subspecialty of pediatric allergy and immunology because he specialized in the subject subsequent to the time (1974) of the alleged acts of malpractice. This they argue prejudiced their case because they were unable to introduce Dr. Atwater's testimony regarding allergies. We note that the facts stated in plaintiffs' arguments are at variance with the record presented to us. The record shows the doctor was permitted to testify as a pediatrician even though he was not a pediatrician at the time Dr. Terral treated the child in 1974, but refused to let him qualify as an expert in the subspecialty *1289 of allergy and immunology because he was not qualified in the subspecialty at the time of his examination of the child. However, the record (Vol. 13, pg. 136) reveals Dr. Atwater did respond to plaintiffs' counsel's question"Doctor, as an allergist, what is your expert opinion about the use of those injections [antibiotic injections prescribed by defendant doctors for allergies] on that child?" The answer given by the doctor covered two and one-half pages of testimony, none of which was objected to by the defendants. Hence, the testimony was in fact submitted to the jury.
Plaintiffs contend the trial judge also erred in refusing to allow Dr. Vogel to respond to questions as to whether electrolyte tests should have been conducted on the child. This they argue prejudiced their case. Again, the facts relied on by counsel in his arguments are at variance with the record. Dr. Vogel candidly admitted that he did not treat children for childhood illnesses and did not feel qualified to testify to the pediatric standard of care. (See Vol. 20, pp. 36-37).
Hence, we cannot say the trial judge's ruling relative to Dr. Atwater or Dr. Vogel was harmful to or prejudiced the plaintiffs' case.
With respect to Dr. Ritota, plaintiffs contend the court erred to their prejudice in confining his testimony to areas of general practice. According to the testimony given when qualified as an expert, Dr. Ritota entered general practice in 1947 and started special studies in cardiology in 1953. He never practiced as a primary care pediatrician and said seventy-five percent of his practice was devoted to the practice of cardiology. Only one to three percent of his cardiology practice involved treatment of pediatric cardiology patients.
The trial judge heard evidence from Dr. Ritota as well as other experts as to the practice of pediatrics. Additionally, he elicited from the doctors the areas which were common to their practice of medicine. After hearing all the arguments and evidence, he allowed Dr. Ritota to testify as to causation, record keeping and matters not pertinent to a pediatric standard of care or how the child should have been treated generally. The jury was not informed of the limitation on the doctor's testimony until the questions of counsel and the answers of the witness sought to elicit evidence in the restricted area. In reaching his decision, the trial judge also noted that Dr. Huang and Dr. Atwater had already testified at great length regarding the pediatric standard of care, hence, Dr. Ritota's testimony would only be cumulative.
Considering the above and in view of the burden of proof imposed on the plaintiffs by R.S. 9:2794 we cannot say the trial judge committed reversible error in imposing the restrictions which he did on Dr. Ritota.

ASSIGNMENT OF ERROR NO. 4
Under this assignment the plaintiffs cite as additional prejudicial error the court's admission of the testimony of Doctors Tardo, Starett and Pfeiffer, medical experts affiliated with Ochsner Developmental Clinic, notwithstanding defendants' failure to timely produce the doctors' written reports. Plaintiffs' counsel argues that appellees were engaged in a pattern of non-disclosures which culminated in the testimony of these witnesses being introduced without benefit of discovery and as a total surprise to plaintiffs. The facts utilized by the plaintiffs in making the arguments are at variance with the record presented to us.
This suit was originally filed in the district court in April 1976. Trial on the merits did not start until February 28, 1983. The record reflects that over the seven year history of the case numerous discovery motions were filed, examinations ordered and depositions taken. Most were "hotly" contested. The ones involving Drs. Tardo, Starett and Pfeiffer were no exceptions.
The defendants' witness list, submitted to the plaintiffs in mid-October 1982, listed Doctors Tardo, Starett and Pfeiffer, all affiliated with Ocshner Developmental Center, as defense witnesses for the trial scheduled to commence on February 28, *1290 1983. Apparently, after voluntary dates had been agreed upon for the examination of the child by doctors and other personnel at Ochsner Developmental Center and for subsequent taking of depositions of the doctors, counsel for plaintiffs informed defense counsel the child would not be submitted for examination. As a result, the defendants filed a rule to compel the examinations. Following a hearing on January 17, 1983 the court ordered the examinations. They were completed before the trial commenced on February 28, 1983.
In response to a subpoena duces tecum, on March 3, 1983 Ochsner submitted medical records of Ochsner Foundation Hospital and Clinic. These records contained the handwritten notes of Drs. Tardo, Pfeiffer and Haase. Counsel for defendants contends formal typed reports were not available until some time later and copies of same were given to plaintiffs' counsel as soon as these became available. Except for the contention the reports were deliberately delayed or withheld, plaintiffs' counsel does not contest or dispute these events.
Although counsel for plaintiffs contends the written reports of Ochsner's experts were deliberately delayed or withheld, there is no proof this occurred. At no time did plaintiff make any effort to depose the Ochsner experts or seek a continuance because of his inability to depose them prior to or during trial. There was ample opportunity for plaintiffs' counsel to discover the evidence. Hence, we cannot say the trial court erred in admitting the testimony. Further, in light of these circumstances, we cannot say the plaintiffs were "prejudiced" by the actions of the defendants or of the trial court.
Considering the length of the trial, the number of witnesses and the complexity of the issues, and the record as a whole, based on our review of the record we believe the trial judge performed his function exceedingly well and free of any reversible error.

ASSIGNMENT OF ERROR NO. 5
The remaining assignment of error is directed toward the jury's verdict rather than the judge's rulings. The jury absolved Drs. Mendoza and Wexler of negligence but found Dr. Terral was negligent. However, it found his negligence was not the cause of the child's brain damage. Plaintiffs contend the jury erred in failing to find Drs. Mendoza and Wexler negligent along with Dr. Terral and their individual or combined negligence was the cause of the child's brain damage.
In his brief, counsel for plaintiffs points to the testimony of his experts and/or the answers to specific questions directed to the defendants or to their experts in support of his argument the jury erred in failing to find for the plaintiffs. Although there is evidence in the record which would support a finding for the plaintiffs, in the absence of legal error we cannot overturn the jury verdict unless we first find the jury was clearly or manifestly wrong in reaching its findings of fact (Canter, supra, Arceneaux, supra). Stated another way, our function is to determine whether the record contains sufficient evidence to support the jury's findings and not whether we can make some other fact finding which is more to our liking.
This case is a classic example of what happens in a tort action where negligence turns on opinion evidence. The expert medical opinions offered by the defendants are in conflict with or diametrically opposed to the medical experts' opinions submitted by the plaintiffs to support plaintiffs' theory of negligence and causation. This, in our view, is not a reflection on the integrity of the individual expert witnesses or of the medical profession. Rather, it demonstrates the fact that medicine is not an exact science; hence, there are differences of opinion within the profession as to the diagnostic tests which should be conducted in a given set of circumstances or as to the effectiveness and side effects resulting from the administration of a particular drug, its dosage or the number of times administered and as to the diagnosis when the objective symptoms are agreed upon. Therefore, there were substantial differences of opinion as to what constituted "the degree of care ordinarily practiced by pediatricians" as well as to whether *1291 the doctors involved here exercised that degree of care in this instance. The mere choosing by the jury of one expert's views over that of another does not in and of itself constitute reversible error.
Plaintiffs' entitlement to damages depended on their ability to prove by a preponderance of the evidence their theory of negligence and causation as to each doctor individually or in combination. The effort was to show that Dr. Terral's failure to maintain proper records, coupled with inadequate diagnostic tests, resulted in improper or excessive administration of antibiotics, thus causing diarrhea which led to dehydration and resulted in brain damage. The defendants defend by attacking each link in plaintiffs' chain with a counter or counteracting theory; i.e., (1) the diagnostic test and antibiotics administered both as to kind and dosage, and the number of times administered were consistent with the standard of care ordinarily practiced by other pediatricians, (2) as to Drs. Terral and Mendoza, the diarrhea which did occur was not sufficiently severe to result in dehydration, (3) as to Dr. Wexler, no diarrhea occurred, and (4) there was no brain damage; rather, the child was suffering from a learning and/or sleeping disability which was totally unrelated to antibiotic abuse.
In support of the attack the defendants in addition to their own testimony submitted the following:
Dr. Richard Levy, a neurosurgeon, testified there was no relationship between the child's problems and the episodes of dehydration at Southern Baptist Hospital and/or the intermittent episodes of alleged dehydration while under Drs. Terral, Mendoza and Wexler's treatment. In his opinion brain damage would not occur from dehydration unless a coma or semi-coma was associated with it. There is no evidence in the record that the child was comatose or semi-comatose prior to or during his stay in Southern Baptist Hospital. Rather, the hospital record shows the child was awake and alert during his stay in the hospital and in fact had to be given medication to calm him down. In his opinion, the child was not suffering from brain damage because all EEG results were normal. It was his impression the child had severe emotional difficulties with mild organic or physical brain function unrelated to the dehydration episodes of infancy.
A pediatrician with a subspecialty in pediatric pulmonary diseases, Dr. Alma Gates, supported Dr. Levy's opinions as to lack of any relationship between the child's problems and the treatment received. She suggested the possibility of causes other than brain damage for the child's described behavior. Also, from her review of Southern Baptist Hospital's records, she found no evidence of anything which would have caused brain damage. Her opinion in this respect was based on the urinalysis test and hemoglobin done while the child was in the hospital. She also noted that the child voided nine times during his stay at the hospital, thus indicating the child was not dehydrated.
Dr. George Stearns and Dr. Richard Bagnetto, both pediatricians, were of the opinion there was no indication of antibiotic overuse or abuse and the standard of care administered by the treating physicians was consistent with the standard of care ordinarily administered by practicing pediatricians.
The doctors from Ochsner's Developmental Clinic attributed the child's problems to a learning disability and/or nightmares or sleeping fears and not brain damage. Based on the child's history, the evaluation conducted by Dr. Starett and a review of all medical records, in their opinion they saw no medical event in the child's history that could have caused injury to the child's brain or could have caused his learning disorder; nor did they believe the child was suffering from a seizure which would have been indicative of brain damage.
The case was "hotly contested" and well tried. The jury's function was to decide for or against the plaintiffs. It did the latter. We cannot say it erred for there is ample evidence in the record to support its verdict.

*1292 CONCLUSION
On appeal the plaintiffs point to no legal errors. In response to their assignments of error as to the judge and the jury, we have carefully reviewed the entire record. We have found no reversible error. Hence, we affirm the trial court's judgment. Appellants are to pay the costs of the appeal.
AFFIRMED.
NOTES
[1] Diarrhea is a watery, voluminous stool occurring 7 or 8 times during the day. Loose or soft stool contain firm matter as opposed to watery and occurs less than 5 times a day.
[2] The doctors were all named defendants by plaintiffs, but neither doctor cross-pleaded the other.