811 So.2d 1085 (2002)
Rhoda JOHNSON, on Behalf of Her Minor Daughter, Renata JOHNSON
v.
Melvin DUMAS, Sr., et al.
No. 01-CA-1153.
Court of Appeal of Louisiana, Fifth Circuit.
February 26, 2002.
*1087 Richard P. Ieyoub, Attorney General, John H. Ayres, III, Assistant Attorney General, Baton Rouge, LA, for State of Louisiana, through the Department of Transportation and Development, Defendant-Appellant/Cross-Appellee.
Troy A. Broussard, Allen & Gooch, a Law Corporation, Lafayette, LA, for Melvin Dumas, Defendant-Appellee/Cross-Appellant.
Robert M. Becnel, Laplace, LA, for Renata Johnson, Plaintiff-Appellee.
*1088 Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS and SUSAN M. CHEHARDY.
CHEHARDY, Judge.
This appeal concerns apportionment of liability between two defendants cast in judgment for damages arising from a school bus accident as well as the quantum awarded for general damages. We affirm.
On April 17, 1996, 16-year-old Renata Johnson was a passenger on a school bus that overturned on the shoulder of Louisiana Highway 20 in St. James Parish. Renata was injured in the accident. Her mother subsequently brought suit on her behalf against various defendants, including Melvin Dumas, Sr. (the bus driver) and the State of Louisiana through the Department of Transportation and Development, hereafter called "DOTD" (the state agency responsible for highway construction and maintenance).[1] Plaintiff alleged that Dumas was negligent in his driving and that DOTD was negligent in its design and/or maintenance of the road, because of a drop-off on the road shoulder where the bus overturned.
After a three-day trial, a jury found that the bus driver was negligent and his negligence was a cause of the accident; that the driver of an oncoming vehicle, which the bus driver claimed had forced him off the road, was not negligent; that the roadway on which the accident occurred presented an unreasonable risk of harm to others; that DOTD knew or should have known of the existence of the roadway condition; that DOTD had a reasonable opportunity to remedy the condition but failed to do so; and that the defective condition of the roadway was a cause of the accident in question.
The jury apportioned fault at 80% to DOTD and 20% to Dumas and awarded plaintiff damages in the amount of $319,330.00, of which $250,000.00 was general damages. The trial court rendered a judgment in accordance with the jury's verdict. Defendant Dumas filed a motion for judgment notwithstanding the verdict, which was denied. DOTD and Dumas both appeal.

FACTS
Melvin Dumas testified that on the day of the accident, he was driving the bus on Highway 20 heading north toward Vacherie. As he passed the intersection with Highway 644 a vehicle turned in front of him. He slowed and let the vehicle go, then he picked up speed. As he got approximately half a mile from the intersection, he noticed three vehicles coming toward him and another vehicle, a pickup truck, attempting to pass the cars. Dumas said that as the pickup truck attempted to overtake his lane, he moved over to try to give it room because he knew there wouldn't be enough time for it to pass every vehicle in line coming toward him. When Dumas moved the bus over, its wheels hit the edge of the road, which made the bus go in the ditch sideways, running two wheels along the ditch. He *1089 turned the wheels and the bus went up and over to the left lane, then started sliding. He corrected it, then it overbalanced or unbalanced, went on one side, and started sliding on its side.
At trial Dumas said he did not recall how fast he was driving the bus, although he had testified in his deposition that he was going 25 miles per hour. He testified the posted speed limit was 45 miles per hour and he disagreed with the state police investigator's estimate of his speed as being 52 miles per hour.
Dumas said he told the state trooper that he must have hit a soft spot in the road, but his trial testimony was contradicted by his deposition, in which he denied saying that to the trooper. At trial he also stated that he hit the brakes "probably two times" and that he told the state trooper someone tried to run him off the road, but said that the trooper did not include that in the accident report. He denied stepping on the accelerator and said he slowed down before going off the road. He did not blow his horn.
Three witnesses who were driving in cars behind the school bus denied seeing any oncoming cars trying to pass in front of the school bus. Two of them testified they saw the wheels on the back-end passenger side of the bus go off the edge of the road. After the back end of the bus on the passenger side went off, the driver tried to regain control, but the bus began swerving and fish-tailing until it flipped over on its side and skidded across both lanes into the ditch. Those two witnesses, Gail Louque and Ramona Kliebert, said that if there had been oncoming traffic any car in the path of the bus would have been wrecked.
Louque said she had been traveling behind the bus for a while and they were going approximately the same speed, because she was neither gaining on him nor being left behind. She estimated her speed at 40 to 45 miles per hour.
Trooper John Baltes of the Louisiana State Police, who investigated the accident, was accepted as an expert in accident reconstruction. He said that Dumas told him he hit a soft spot in the road, lost control, and went off into the ditch; to avoid hitting an adjacent telephone pole, he pulled back onto the highway, then lost control of the bus and it overturned. Baltes stated he put "soft spot" in quotes on his report to indicate it was a direct quote from the witness. Baltes said Dumas did not mention any other vehicle being involved in his losing control of the bus.
Baltes determined that Dumas was speeding, that he left the road due to carelessness, and that if there had been an improved shoulder of the road the accident probably would not have happened. He found that the primary cause of the accident, other than Dumas' carelessness, was Dumas' inability to control the vehicle or failure to properly re-enter the roadway after he encountered the drop-off on the side of the road. Baltes said the physical evidence indicated that the bus left the highway gradually, drifting off the roadway, not abruptly steering to avoid an oncoming vehicle or an obstruction in the roadway.
Baltes testified that the posted speed limit is 45 miles per hour. He estimated Dumas' minimum speed was 52 miles per hour. He said at the point where the bus left the roadway, the drop-off is approximately 12 inches; at the point where it reentered the roadway the drop-off is approximately seven inches.
I. Robert Ehrlich testified as an expert in the field of accident reconstruction. He *1090 had reviewed the witnesses' statements, affidavits and depositions, photographs of the accident scene, and a diagram of the roadway cross-section. He concluded that Dumas was negligent in letting his vehicle go off the road to the right and that he compounded that problem by turning hard to the right after he went off the road on the other side, which caused his vehicle to roll over. Ehrlich noted that a shoulder drop greater than five inches is considered unsafe. The shoulder drop here was between seven and 12 inches. Beyond the drop of the pavement, he said, there is a steep drop-off in the ditch.
Ehrlich estimated that the bus was going 55 miles per hour when it went off the road. He said the speed did not cause the accident, but aggravated the consequences of the accident. The bus was traveling off the side of the road with its undercarriage dragging on the edge of the road for 180 feet. Ehrlich noted that Dumas said he applied his brake twice, plus the scraping of the undercarriage would have slowed him down unless he were accelerating. Thus, in Ehrlich's opinion, Dumas left the road at a higher speed than when he regained it. Ehrlich found no evidence that another driver forced the bus off the highway.
Olin K. Dart testified as an expert in the field of highway design, traffic safety, and accident reconstruction. He related that the highway pavement had been widened to 24 feet in a roadway overlay project the year before the accident. There were two 12-foot lanes, marked with edge lines and a dashed yellow center line on a straightway. At the place where the accident occurred, there was a very sharp drop-off into a two- or three-foot ditch. The drop-off was 12 inches where the bus went off the road and seven inches where it came back on the road. When Dart saw it three years post-accident, there was still a substantial drop-off in the range of eight or nine inches, with no shoulder in that stretch. He considered that the most critical defect in the road.
According to Dart, on the opposite side of the road at the point where the accident happened, there is a shoulder that averages two or three feet. The plans for the overlay project called for a shoulder with an average width of two feet. He said the minimum shoulder width required by safety specifications is two feet and that having no shoulder at all is totally unacceptable. In his opinion the absence of a shoulder posed an unreasonable risk of harm to motorists.
Dart calculated Dumas' speed at about 46 miles per hour. He also calculated that there would have been time for a group of four oncoming vehicles to have gone past in the time the bus was off the right side of the road before it pulled back on, so he felt that Dumas' version of why he went off the road could be true. Dart stated that if Dumas had not left the road, the accident would never have happened, because that is when the whole sequence of events started.
Captain Gufielle Keller of the St. James Sheriff's Department testified he is related to Melvin Dumas and that Dumas told him he had to take evasive action because of a motorist. Dumas also told him the accident happened due to the steep drop of the shoulder of the highway.
Melvin Dumas, Jr., the defendant's son, testified that at the hospital following the accident, his father told him that a truck "jumped out" to pass three vehicles and took over the lane, so defendant tried to ease over to give it enough room to squeeze between him and the first vehicle.
*1091 Zona Gipson, daughter of Melvin Dumas, Sr., testified that her father told her there was no shoulder on the road because they were repairing the road. He did not mention anything about a soft spot in the road. She overheard him tell two state troopers who interviewed him at the emergency room that he was trying to avoid a head-on collision with a truck that was passing some vehicles. so he steered the bus out of the way.
Francis Wyble, an expert in the fields of geometric design, highway maintenance, and accident reconstruction, testified that Louisiana Highway 20 came into the state system in 1921. There has never been either a construction or reconstruction on the highway. The safety standards now in effect were not available when Highway 20 was built. The project done on Highway 20 in 1995 was a resurfacing. Overlay standards are simply to maintain the existing highway system and to make it more comfortable and safe for the motorist.
Wyble said the plans for the 1995 project indicate there were two 10-foot lanes. The base would have been 21 feet wide, which means about six inches overhang on each side of the pavement and whatever the existing shoulders were. On this contract they widened the original base to the point where they could put in two 12-foot lanes. As a result, on one side there is still some shoulder but on the other side the pavement took all of the existing shoulder. The drop-off goes from the edge of the road down to the front slope, which technically is part of the ditch.
According to Wyble, research has proven over the years that it is better to widen the travel lanes at the expense of the shoulder than to try to maintain narrow lanes and narrow shoulders. The specification on the project plans for a two-foot average shoulder is to provide contractors with a basis to calculate the amount of material they will need in order to figure a bid on the project. The intent of the project was to improve the riding surface of the road.
Wyble calculated Dumas' speed at 57 miles per hour. He acknowledged that every calculation of expert witnesses in the case, although varying in speed estimate, indicated that Dumas was traveling over the speed limit of 45 miles per hour. Once Dumas left the roadway, he over-steered to regain the roadway, which put him heading for the opposite side of the road. According to Wyble, this happens so quickly that in most cases the driver cannot correct by counter-steering, which is what happened with Dumas. If he had been going slower, he probably just would have ended up in the ditch and would have stopped.
According to Wyble, Highway 20 is a typical old Louisiana highway and the state lacks funding to bring such old highways up to standards. He said they are not hazardous as long as you stay on them, but if you get off them it can be hazardous. Wyble stated that the primary purpose of road shoulders is for lateral support of the roadbed and for emergency stopping. He agreed that the lack of a shoulder contributed to Dumas' having problems regaining the roadway. Wyble testified that in examining the accident site he had walked the roadway itself and he found no soft spots in the roadway. He said the physical evidence did not bear out Dumas' testimony that he was driving 20-25 miles per hour.

APPEAL OF DOTD
DOTD contends the trial court erred in assessing only one-fifth of the fault for this accident to Dumas. DOTD asserts that a *1092 combination of negligent actions by Dumas-speeding, inattentiveness, overcorrecting in an attempt to regain control of the bus-constitutes more than slight or minor negligence. Further, DOTD contends that its action in widening the travel lanes of a 20-foot highway by four feet at the expense of the pre-existing highway shoulder has significant social utility.
DOTD argues that the negligent bus driver should bear at least 50% of the fault. DOTD does not contest apportionment of some fault to the State. However, it argues that the lack of a shoulder on the right lane was due to expansion of the travel lanes of the roadway from ten feet to twelve feet wide, at the expense of the road shoulder. Citing cases in which courts have previously held that expanding travel lanes at expense of road shoulders is an acceptable practice,[2] DOTD contends the overall utility of the practicethe significant increase in width of the travel lanes, resulting in less chance that a vehicle will leave the travel laneoffsets the danger of lack of a road shoulder.
In Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 So.2d 670, 680-681, the supreme court stated:
This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination.... As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. [Citations omitted.]
Thus, the appropriate standard of review of a factual dispute is that a finding of fact by the trial court should be upheld "unless it is clearly wrong," or manifestly erroneous.
In reviewing the record, we note that photographs of the site of the accident show that Highway 20 is in a rural area surrounded by sugar cane fields. On either side of the road is a drainage ditch several feet deep. The pictures show the extreme drop at the edge of the road, from the thick asphalt road surface abruptly down into the side of the ditch. The edge of the road is just a few inches over the white fog-striping line.
In order for the DOTD to be held liable, the plaintiff must prove that (1) the DOTD had custody of the thing which caused plaintiffs' damages, (2) the thing was defective because it had a condition which created an unreasonable risk of harm, (3) the DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) the defect was a cause-in-fact of plaintiffs' injuries. *1093 Cormier v. Comeaux, 98-2378, p. 6 (La.7/7/99), 748 So.2d 1123, 1127, citing Brown v. Louisiana Indem. Co., 97-1344 (La.3/4/98), 707 So.2d 1240, and Lee v. State Through Dept. of Transp. and Development, 97-0350 (La.10/21/97), 701 So.2d 676.
The DOTD has a duty to maintain the public highways in a condition reasonably safe for persons exercising ordinary care and reasonable prudence and this duty extends to the shoulders of highways as well. Brown, 707 So.2d at 1242. DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that a motorist might find himself traveling on, or partially on, the shoulder for any number of reasons, including simple inadvertence. Rue v. State, Dept. of Highways, 372 So.2d 1197, 1199 (La.1979). This duty extends to drivers who are slightly exceeding the speed limit or momentarily inattentive. Cormier, 98-2378 at p. 6, 748 So.2d at 1127; Ledbetter v. State, Through Louisiana Dept. of Transp. and Development, 502 So.2d 1383, 1388 (La.1987).
In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), the supreme court established guidelines for apportionment of fault under comparative negligence:
We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. [Footnotes omitted.]
469 So.2d at 973-974.
According to DOTD, applying the Watson factors demonstrates that defendant Dumas' actions did not constitute minor or insignificant negligence: Dumas admitted he had driven that particular stretch of highway twice a day for two or three years; clearly, he had an awareness of the road's lack of a shoulder. Dumas was driving a school bus with several young children aboard; he was speeding, he was not paying attention to his driving, and he overcorrected once he got back on the highway. DOTD contends these factors illustrate the risk was great. DOTD asserts, "While driving children to school certainly has social utility, it cannot be said that speeding and failing to pay attention to one's driving has any utility. Arriving at school just a few minutes earlier is hardly worth the risks assumed by speeding *1094 in a school bus." Dumas' own expert, Olin Dart, testified that as a bus driver driving a bus, Dumas was acting as a common carrier and was entrusted with the highest degree of care in operating the vehiclemore than an ordinary motorist.
DOTD argues there were no extenuating circumstances proven by Dumas and that the party with the last clear chance to avoid the harm was the bus driver, Dumas. Finally, DOTD points out that Dart, the driver's own expert, testified that no defect caused Dumas to leave the road and that no accident would have occurred had the driver not left the road. Accordingly, DOTD contends apportioning only one-fifth of the fault to the bus driver was clear error and the apportionment of fault should be reconfigured, either to 75% of the fault or, at the least, to equal fault with DOTD.
DOTD points out the numerous discrepancies in Dumas' testimony, both between his deposition and his statements at trial and within his trial testimony itself. Those discrepancies, however, were presented to the jury. The extent to which they considered Dumas' credibility as affecting DOTD's culpability is immaterial; the jury heard all the witnesses, viewed all the evidence, and reached their own conclusions regarding the causes of the accident. Reviewing the record as a whole, we are unable to say that the jury committed manifest error in its determination of proportionate fault of the defendants.

APPEAL OF DUMAS
Dumas contends the trial court improperly restricted the cross-examination of Randy Folse, precluding the jury from hearing testimony which would significantly affect his credibility and culpability. Second, he asserts that the jury was clearly wrong in finding no fault on the part of Randy Folse. Third, he argues that the jury's general damages award of $250,000 was excessive in light of the injuries sustained by the plaintiff. With respect to DOTD's appeal, Dumas contends the jury's apportionment of fault between himself and DOTD was proper and should not be disturbed on appeal.
Randy Folse testified he was a student at E.D. White High School in Thibodaux at the time of the accident. He lived in South Vacherie and left his house in the morning at approximately 6:45 a.m. to travel south on Highway 20. According to Folse, the site of the accident was in the opposite direction from his route to school and he never went that direction before school. He denied any involvement in the accident and said he heard about the accident after he got to school that morning. He said other students teased him about causing the accident because he was one of the few who made it to school that morning from Vacherie due to the traffic tie-ups resulting from the accident.
Counsel for Dumas attempted to impeach Folse's testimony by trying to elicit evidence that he refused to return calls from defense counsel and that he had falsely denied knowing those calls were in regard to the bus accident. Further, Dumas argues that Folse incriminated himself by stating he believed he would hear from his insurance carrier if there was a claim that he had been involved in the bus accident (thus implying Folse had guilty knowledge of the accident). Pursuant to a motion in limine, the court refused to allow counsel for Dumas to cross-examine Folse on that point. Dumas contends that ruling was error because the testimony is relevant to his credibility and his culpability and could have led the jury to finding that *1095 Folse's behavior was consistent with his being involved in the accident.
In reaching a decision on the alleged procedural errors, we have to consider (1) Was the particular ruling complained of in error and, if so, (2) Did the error harm or prejudice the plaintiffs' cause, for unless it does, reversal is not warranted. * * * Further the party alleging error has the burden of showing the error was prejudicial to his case. In other words, the determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case.
Neumeyer v. Terral, 478 So.2d 1281, 1285 (La.App. 5 Cir.1985), writ denied, 481 So.2d 631 (La.1986).
The jury heard the remainder of Folse's testimony, in which he denied having anything to do with the bus accident or knowing about it prior to his arrival at school that morning. We find no prejudice, since the tenor of all the cross-examination of Folse by counsel for Dumas was to challenge his credibility. The testimony excluded by the motion in limine was for the same purpose, but would have neither significantly rehabilitated the impression made by Dumas nor substantially worsened the impression made by Folse. We conclude the granting of the motion in limine was not error.
We also find no merit to Dumas' assertion that the jury was clearly wrong in finding that Folse was not at fault in causing the accident. The conflicting testimony by Dumas and Folse is precisely the situation in which the credibility rule must be applied: to wit, where conflict exists in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Cormier, 98-2378, p. 5, 748 So.2d at 1127; Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). We find no ground on which to disturb the credibility determinations of this jury.
Finally, Dumas asserts the $250,000.00 award is clearly excessive because "there was nothing truly exceptional or extraordinary" about plaintiff's injuries, her treatment, or her response to the injuries and treatment when compared to similar cases.
The medical evidence is that Renata Johnson suffered a knee injury that has required two arthroscopic surgeries and will require a third, more extensive open surgery in future. After the accident Johnson had complaints of neck, back, left knee and left wrist pain. She was treated for four months by Dr. Roland Waguespack, a family practitioner, who restricted her activities and prescribed a knee brace as well as medication. However, she continued to have problems and Dr. Waguespack referred her to an orthopedist, Dr. V.J. Zeringue, for further treatment of her knee.
Dr. Zeringue treated her neck, back and knee pain conservatively and barred her from participating in competitive sports. When she her pain and movement problems did not resolve, Dr. Zeringue recommended she undergo knee surgery and referred her to Dr. Joseph Rauchwerk, an orthopedic surgeon.
When Dr. Rauchwerk first saw Renata Johnson in July 1997 (more than a year post-accident), she was complaining of back pain, left knee pain, headaches, and recurrent giving-out episodes of the left knee joint. Dr. Rauchwerk's assessment was post-traumatic chondromalacia superimposed on pre-existing malalignment syndrome *1096 of the extensor mechanism or subluxating patella, and symptomatic left knee lumbar syndrome. He related the condition to trauma suffered in the school bus accident. He performed arthroscopic surgery in August 1997. She subsequently required a second arthroscopic surgery to release adhesions resulting from the first surgery. Dr. Rauchwerk said Renata retains a ten percent permanent partial impairment of the leg and may need additional surgery in the future.
Dr. Timothy Finney, an orthopedic surgeon who examined plaintiff prior to her second surgery, testified that he found the second surgery was necessary. Considering her continuing complaints even after the second procedure, Dr. Finney suggested that the only option would be for plaintiff to undergo a third operation, an open knee surgery consisting of a proximal distal alignment.
This is a major surgery that requires an eight-inch incision and a difficult rehabilitation period of six to 12 months. If she does not have the third surgery, she will continue to experience "giving-out" episodes of the knee joint. Even after the third surgery, her restrictions will remain the same and she likely will suffer problems with the knee for the rest of her life. She is restricted from climbing stairs and has sustained significant atrophy of the quadriceps muscle on the affected leg. Her knee continues to throb, burn, swell and give-out, and she has chronic pain that prevents her from standing or walking for long periods of time, even with use of a knee brace.
Testimony by plaintiff established that her injury caused her to make significant changes in her lifestyle. Before the accident she was actively involved in competitive sports, which she could no longer pursue after the accident. She suffered months of pain before and after her prior surgeries and limitations on her both her daily and extracurricular activities. During the middle of her high school years she was forced to change from life as a normal teenage girl to months of invalidism and limitations. In addition, she suffered mental anguish and fear of death during and after the accident itself. Her grades dropped due to her missing school to attend physical therapy.
Plaintiff had nightmares for several months after the accident and suffered depression that required treatment by a psychiatrist, who prescribed medication to enable her to cope with her emotional problems.
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993). The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Id. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Id.
The trier of fact is accorded vast discretion in fixing general damage awards, such that an appellate court should rarely disturb an award of general damages. Duncan v. Kansas City Southern Railway Co., 00-66, p. 13 (La.11/3/00), 773 So.2d 670, 682. The appellate court's *1097 role in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Id.
Applying these principles to the record, we find no abuse of discretion by the jury and no basis on which to disturb the award.
For the foregoing reasons, the judgment is affirmed. Costs of this appeal are assessed equally against the appellants.
AFFIRMED.
CANNELLA, J., dissents.
CANNELLA, J., dissenting.
I would reduce the fault of the DOTD in this case to 50%. The actions of the Defendant, Melvin Dumas (Dumas), created a significantly more unreasonable risk of harm than the defective drop off from the highway surface. Dumas was driving a school bus with children on board, was speeding and was not paying attention to his driving, and he overcorrected when he entered the highway. Since Dumas was driving a common carrier, he had a higher duty of care than a regular motorist to operate a vehicle safely. Dumas was the party with the last clear chance to avoid the accident, and no defect on the roadway caused him to leave the road. Further, the evidence shows that, although the newly expanded roadway to 12 foot lanes had no shoulder at that point, this is still safer than a highway with narrower lanes of travel with a narrow shoulder. Thus, I would find Dumas and the DOTD each to be 50% at fault.
NOTES
[1] In addition to Dumas, the original petition named as defendants St. James Catholic Church (Dumas' employer) and Virginia Surety Company (its liability insurer). By amending petition plaintiff added as defendants Randy Folse (alleged to be driver of an oncoming vehicle that Dumas claimed swerved into his lane) and DOTD (for design, construction and maintenance of the roadway). St. James Catholic Church, Virginia Surety and Folse all were dismissed by directed verdict after conclusion of plaintiff's case-in-chief.
[2] Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170 (La.1986); Cormier v. Comeaux, 98-2378 (La.7/7/99), 748 So.2d 1123.