866 So.2d 837 (2002)
Salvador R. DUZON, Carolyn R. Duzon, on behalf of the Community of Acquets and Gains, Individually and on behalf of the Minor Children, Salvador Duzon, Jr. and John R. Duzon, and Tomas Paral, Personal Representative of the Estate of Andy S. Paral
v.
Thomas L. STALLWORTH, Queen Bee Transport, Inc., Venture Transports, Inc., Reliance National Indemnity, Cal-Dive International, Inc., and ABC Insurance Company.
No. 2001 CA 1187.
Court of Appeal of Louisiana, First Circuit.
December 11, 2002.
Order Denying Rehearing January 29, 2003.
Writ Denied May 2, 2003.
*844 Richard J. Dodson, Kenneth H. Hooks, III, Baton Rouge, Jerald P. Block, Thibodaux, Counsel for Plaintiffs/Appellees Salvador R. Duzon, Carolyn R. Duzon, on behalf of the Community of Acquets and Gains, Individually and on Behalf of the Minor Children, Salvador Duzon, Jr. and Joseph R. Duzon.
Michael A. Colomb, W. Steven Mannear, Baton Rouge, Counsel for Defendant/Appellee Tomas Paral, Personal Representative of the Estate of Andy S. Paral.
T. Patrick Bayham, Steven K. Best, Metairie, Counsel for Defendant/First Appellant Cal Dive International, Inc.
S. Daniel Meeks, John B. Esnard, III, Metairie, L. Charles Caillouet, Thibodaux, Christopher J. Aubert, Covington, Counsel for Defendants/Second Appellants, Thomas L. Stallworth, Queen Bee Transport, Inc., Venture Transport, Inc., and Reliance National Indemnity Co.
Thomas P. Anzelmo, Sr., Metairie, Counsel for Defendant/Appellee Wal-Mart Stores, Inc.
Before: WHIPPLE, DOWNING and PATTERSON,[1] JJ.
DOWNING, J.
This litigation arises out of a December 18, 1998 accident wherein two crewmembers serving aboard a ship docked in Fourchon, Louisiana, were returning to the vessel on a bicycle when an eighteen-wheeler truck hit them from behind. One of the crewmen died; the other suffered serious permanent injuries. After a trial on the merits, the jury returned a verdict in favor of the surviving crewmember and in favor of the parents of the deceased crewmember, and awarded damages. The jury allocated fault among the crewmembers, the shipowners, the driver, the owners and the insurers of the truck. The shipowners and the liable parties associated with the truck appealed the judgment. The parents of the deceased crewmember and the surviving crewmember filed answers to appeal.
For the following reasons, we affirm in part, amend in part.

*845 FACTS AND PROCEDURAL HISTORY
On the night of December 18, 1998, Salvador Duzon (Duzon) and Andy Paral (Paral), Filipino seamen working as stewards on the vessel, the M/V Witch Queen, borrowed a bicycle provided for use by the crewmembers and rode it to a convenience store. While they were returning to the ship, with Duzon seated on the handlebars and Paral on the seat pedaling the bicycle, an 18-wheeler truck hit them from behind. Thomas Stallworth, an employee of the truck's owner, Queen Bee Transport, Inc. (Queen Bee), was driving. Venture Transport, Inc., was the legal operator of the truck. These parties are here collectively referred to as "Stallworth." Duzon was seriously injured and now suffers permanent disability. Paral died as a result of the accident.
Duzon and Paral's parents, as his legal representative and in their own right, sued the M/V Witch Queen's owner, Cal Dive International, Inc. (Cal Dive), alleging among other things that it owned the bicycle, that the bicycle was defective, and that this made the M/V Witch Queen unseaworthy. They also alleged that Cal Dive failed in its duty to provide the crew with bicycle safety training. Plaintiffs also sued Stallworth and their insurer, Reliance National Indemnity, for damages caused by the driver's negligence.
Cal Dive filed a third-party claim against Wal-Mart claiming Wal-Mart was liable because the bicycle, if defective, was defective when purchased. Wal-Mart was dismissed prior to trial on motion for summary judgment.
A jury trial was held from July 31, 2000 through August 9, 2000. The jury returned a verdict totaling over four million dollars, assigning 10% fault to Cal Dive, 25% fault to Duzon, 25% fault to Paral, and 40% fault to Stallworth. On cross-motions for new trial, judgment notwithstanding the verdict or to amend the judgment, however, the trial court, pursuant to its understanding of the Jones Act,[2] applied the principle of negligence per se and reformed the allocation of fault to attribute 60% to Cal Dive, 40% to Stallworth and 0% to plaintiffs. Judgment was signed accordingly.
Cal Dive and Stallworth both appealed the judgment against them. Paral's parents and Duzon filed answers to these appeals.
We also consider a motion to strike that was referred to the merits of this appeal.

CAL DIVE'S ASSIGNMENTS OF ERROR
Cal Dive assigned the following nine assignments of error on appeal:
1. The trial court committed consequential error, requiring de novo review, when it utilized incorrect and prejudicial jury instructions and ruled to exclude certain evidence related to the blood alcohol levels of plaintiffs.
2. The trial court committed reversible error in applying negligence per se.
*846 3. The trial court committed reversible error by instructing the jury regarding negligence per se.
4. The trial court committed reversible error by "correcting" the jury's findings, and changing its decision from 10% liability against Cal Dive to 60%.
5. The trial court committed reversible error in denying Cal Dive's request for a new trial and/or directed verdict.
6. The trial court erred in excluding critical evidence of the blood alcohol level of plaintiffs as well as evidence of the effects of alcohol on bicycle riders.
7. The trial court committed reversible error by allowing prejudicial and inflammatory comments made by plaintiffs' counsel during closing arguments.
8. The trial court committed reversible error by dismissing Wal-Mart as a third-party defendant from this lawsuit prior to trial.
9. The jury abused its discretion in the allocation of fault and assessment of damages.

STALLWORTH'S ASSIGNMENTS OF ERROR
Stallworth assigned the following six assignments of error:
1. The jury erred in finding that Stallworth had a duty to anticipate and guard against striking a bicycle being operated in the middle of the road at night, by persons wearing dark clothes with no reflective material, in an unlit, rural, industrial area, and without a front headlamp, or a rear retroreflector; or alternatively, if Stallworth owed a duty that encompassed the risk that befell plaintiffs, the jury erred in allocating 40% of the liability for the accident to Stallworth.
2. The trial court erred in charging the jury as to the presumption of negligence of a motor vehicle colliding with the rear of a bicycle, and in failing to charge the jury with the sudden emergency doctrine.
3. The trial court erred in failing to admit evidence of the blood alcohol levels of plaintiffs, and the potential effects of alcohol on them under the circumstances.
4. The trial court was manifestly erroneous in failing to include Brunswick, the bicycle manufacturer, on the jury verdict form.
5. The trial court erred in determining the partial summary judgment rendered in favor of Wal-Mart was final and immediately appealable, in granting Wal-Mart's Motion for Summary Judgment, in precluding evidence of Wal-Mart's negligence at trial, and in refusing to include Wal-Mart on the jury verdict form.
6. The trial court erred in assessing 40% of the responsibility for the payment of cure to Stallworth.

PARAL'S PARENTS' ANSWER TO APPEAL
Paral's parents answered the appeal alleging the following four assignments of error:
1. That the judgment appealed from by defendants be modified to increase the amount of damages awarded in the trial court to an amount more consistent with the facts and law;
2. That the allocation of fault to Salvador R. Duzon and Andy S. Paral be reversed or that the allocation of any fault found on the part of Andy S. Paral be ascribed to his Jones Act employer, Cal Dive International, Inc.;
*847 3. That, as so modified by this Court, the judgment of the trial court be affirmed; and
4. That appellants and defendants below be condemned to pay all costs in the trial court and in this appeal.

DUZON'S ANSWER TO APPEAL
Duzon answered the appeal and assigned the following six assignments of error:
1. That the judgment appealed from be modified to increase the amount of general damages from $625,000.00 to $3,000,000.00;
2. That the judgment appealed from be modified to increase future wages, including past and future found from $90,000.00 to $184,736.73;
3. That the judgment appealed from be modified to find no fault existed with respect to Duzon and Paral;
4. That the judgment appealed from be modified to apply any fault on the part of Andy Paral to his Jones Act employer, Cal Dive International, Inc.;
5. That the amended judgment be affirmed; and
6. That appellant be ordered to pay the legal costs in the trial court and in this appeal.

MOTION TO STRIKE
Duzon also filed a motion to strike part of the record that was supplemented by ex parte order of the trial court. The supplement included affidavits setting forth material not contained in the original trial record and a judgment on costs. By order of this court filed April 23, 2000, the motion to strike was referred to the merits.

DISCUSSION

NEGLIGENCE PER SE
A. GENERAL LEGAL PRECEPTS
Because an employer is liable for the negligence of its employees under the Jones Act, the Jones Act generally provides a broad basis for liability. The Jones Act contains a liberal causation requirement. If the employer's negligence played any part, however small, it results in liability. Brister v. A.W.I., Inc., 946 F.2d 350, 354 (5 Cir.1991). Evidence of the "slightest" negligence is sufficient to sustain a finding of Jones Act liability, and the burden on a plaintiff for showing causation in a Jones Act claim is "featherweight." Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1352 (5 Cir.1988). A trial court's factual findings in general maritime and Jones Act cases are reviewed under this state's manifest error standard of review. Milstead v. Diamond M Offshore, Inc., 95-2446, p. 11 (La.7/2/96), 676 So.2d 89, 96. The Jones Act reads, in pertinent part, as follows:
Any seaman who shall suffer personal injury in the course of his employment may ... maintain an action for damages at law, ... and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply[.]
46 App. U.S.C. § 688(a).
This legislation provides seamen with the rights given to railway workers under the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5 Cir. 1997). "FELA's liberal purpose must be kept in mind when confronting arguments that would restrict an employer's liability under the [Jones] Act." Baker v. Baltimore & Ohio R.R. Co., 502 F.2d 638, 641 (6 Cir.1974); Cox v. Fuglsang, 96-1354, p. 4 *848 (La.App. 3 Cir. 4/30/97), 693 So.2d 883, 886.
The FELA is a clear departure from the common law. Its purpose, in the interest of justice, is to protect those who work in inherently dangerous environments. This is also true for seamen under the Jones Act. Cox, 96-1354 at p. 5, 693 So.2d at 887. The Act advanced twin purposes: "to eliminate a number of traditional defenses to tort liability and to facilitate recovery in meritorious cases." Atchison, Topeka and Santa Fe Railway Co. v. Buell, 480 U.S. 557, 561, 107 S.Ct. 1410, 1413, 94 L.Ed.2d 563 (1987). As the United States Supreme Court explained in Kernan v. American Dredging Co., 355 U.S. 426, 432, 78 S.Ct. 394, 398, 2 L.Ed.2d 382 (1958):
[I]nstead of a detailed statute codifying common-law principles, Congress saw fit to enact a statute of the most general terms, thus leaving in large measure to the courts the duty of fashioning remedies for injured employees in a manner analogous to the development of tort remedies at common law. But it is clear that the general congressional intent was to provide liberal recovery for injured workers, and it is also clear that Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its workers. (Citation omitted.)
Accordingly, the Louisiana Supreme Court directs that, "[i]n the absence of any controlling or persuasive authority we look to the reason of the admiralty rule ... in order to ascertain its appropriate limits." Fegan v. Lykes Bros. S.S. Co., 198 La. 312, 327, 3 So.2d 632, 637 (1941).
B. ANALYSIS
Cal Dive argues that the trial court erred in applying principles of negligence per se against it and in instructing the jury accordingly. Cal Dive makes five specific arguments, which we address in turn.
1. Safety Statute or Regulation
Citing Smith v. Trans-World Drilling Co., 772 F.2d 157 (5 Cir.1985), Cal Dive asserts that violation of a Coast Guard regulation is essential before a factfinder could impose liability under the principles of negligence per se. Cal Dive next argues that at least the violation must be of a specific federal statute. The Federal Employees Liability Act, particularly 45 U.S.C. § 53 provides that "no [covered] employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."[3] (Emphasis added.) The issue before us in this assignment of error is whether safety regulations contained within an international treaty enforceable and enforced by the United States is a "statute" within the meaning of the Jones Act.
In Cabahug v. Text Shipping Co., Ltd., 98-0786, p. 11 (La.App. 1 Cir. 5/12/00), 760 So.2d 1243, 1252, writs denied, 2000-2366, 2000-2367 (La.11/3/00), 773 So.2d 145, 2000-2367 (La.11/3/00), 773 So.2d 145, this court concluded that the trial court was required to identify a specific federal statute "enacted for the safety of employees" that the defendants violated before it could impose negligence per se. In Reyes v. Vantage S.S. Co., Inc., 558 *849 F.2d 238, 242 (5 Cir.1977), the Fifth Circuit noted that "the law is well established that violations of a statute which is intended to protect the class of persons to which a plaintiff belongs against the risk of the type of harm which has in fact occurred is negligence in itself." The term "statute" includes regulations "intended to protect the class of persons to which the plaintiff belongs against the risk of the type of harm which has in fact occurred[.]" See Melerine v. Avondale Shipyards, Inc., 659 F.2d 706 (5 Cir.1981). The court in Reyes equates protective regulations with statutes. Reyes, 558 F.2d at 243.
While all parties agree that the Cal Dive ship was not directly subject to Coast Guard regulations, the United States is a signatory to the 1978 International Convention on Standards of Training Certification, as amended in 1995 (STCW).[4] This treaty is, therefore, the law of the United States. U.S. Const. art. VI, § 2. Further, the treaty itself gives the United States the authority and control to ensure a foreign vessel's compliance with the STCW. STCW art. X. Congress has given responsibility to the Coast Guard to inspect foreign vessels in many circumstances. See 46 U.S.C. § 3301 et seq. Pertinent here is that the Coast Guard can inspect and detain foreign ships for, among other things, noncompliance with basic safety training in compliance with the STCW. USCG Marine Safety Manual, vol. II, § D, Ch. 1, (I)(1)(h)(4).
Regulation VI/1 of the STCW provides: "Seafarers shall receive familiarization and basic safety training or instruction in accordance with section A-VI/1 of the STCW Code and shall meet the appropriate standard of competence specified therein." The regulation then sets out many specific requirements including tables specifying minimum standards of competency. We hold that the violation of the specific requirements of Regulation VI/1 of the STCW may be negligence per se. For example, if the ship fails to instruct a sailor where to locate a life jacket and the sailor drowns because he is unable to locate a life jacket (A-VI/1.4), the trier of fact may find negligence per se, because this is the specific harm which the regulation is designed to prevent.
Plaintiff cites A-VI/2 "Basic Training," subsection 2.1.4 "personal safety and social responsibilities as set out in table A-VI/1-4," specifically, "Observe safe working practices," and the general suggestions for safety training, as a specific statute the violation of which would constitute negligence per se. However, for negligence per se to apply the statute must be specific enough to allow a party's actions to be evaluated objectively. Parra v. Atchison, Topeka and Santa Fe Railway Co., 787 F.2d 507, 509 (10 Cir.1986). Plaintiff introduced expert testimony that captains have a specific understanding of what is meant by this regulation. Although the evidence of custom may be sufficient to establish negligence, to establish negligence per se there must be a specific federal statute, regulation, or regulation mandated by treaty, which establishes specific safety requirements, the violation of which may be evaluated objectively within the language of the regulation. In addition the statute, regulation or treaty requirement must be "specifically aimed at shipping activities." Jones v. Spentonbush-Red Star Co., 155 F.3d 587, 595 (2 Cir. 1998).
In this regard, the jury interrogatory asked the jury, "Do you find that Cal *850 Dive, International, Inc. violated a statute or regulation intended for the safety of its employees and that caused, in whole or part, the accident?" The jury responded, "Yes." It was legal error for the court to give this jury interrogatory.
2. Amended Jury Verdict
Cal Dive argues that the trial court impermissibly amended a judgment when it altered the jury's findings to reallocate the negligence attributed to the plaintiffs to Cal Dive under the principle of negligence per se. The trial court originally entered judgment on August 21, 2000 changing Cal Dive's liability, to include the negligence the jury attributed to Duzon and Paral. After a hearing on October 5, 2000 on cross-motions for new trial, judgment notwithstanding the verdict or to amend the judgment, the trial court signed an amended judgment on October 16, 2000. This judgment maintained the application of Duzon's and Paral's fault to Cal Dive.
Louisiana Code of Civil Procedure art.1971 authorizes a trial court to grant a new trial "for reargument only." The trial court was not erroneous in employing this procedure, and the trial court followed proper procedures to "amend" the judgment. However, the trial court erred as a matter of law in both the original and the amending judgment by allocating plaintiffs' fault to Cal Dive, as discussed above and below.
Cal Dive additionally assigns as error the trial court's denial of its motion for involuntary dismissal. Regarding the motion for involuntary dismissal, La. C.C.P. art. 1672 B grants the trial judge discretion to render judgment or to decline to render any judgment until the close of all evidence. The decision of the trial court denying a motion for involuntary dismissal at the close of a plaintiff's case leaves nothing for this court to review on appeal. Townsend v. Delchamps, Inc., 94-1511, p. 2 n. 1 (La.App. 1 Cir. 10/06/95), 671 So.2d 513, 514 n. 1.
We find no error in the procedures employed by the trial court to reform the jury's verdict and enter judgment, the merits of which are considered elsewhere.
3. Fellow Servant Rule
The jury assigned 25% fault to Duzon, 25% to Paral, and 10% to Cal Dive. When the trial court reformed the verdict and entered judgment, it assigned 60% of the fault to Cal Dive, 0% to Duzon and 0% to Paral.
Cal Dive argues that respondeat superior does not apply here because, it argues, the plaintiffs were not within the course and scope of their employment when the accident occurred. We disagree.
The FELA abolished the fellow-servant rule. Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 542, 114 S.Ct. 2396, 2404, 129 L.Ed.2d 427 (1994). A seaman, in the course and scope of his employment, may recover from his employer for an injury caused in whole or in part by a fellow seaman, even though the fellow seaman is not in the course and scope of his employment. Cox v. Fuglsang, 96-1354, p. 5 (La.App. 3 Cir. 4/30/97), 693 So.2d 883, 886-887.
In Lee v. Mississippi River Grain Elevator, Inc., Barge Div., 591 So.2d 1371, 1373 (La.App. 4 Cir.1991), the court recognized two factors to use in discerning whether a seaman is "in the course of employment" when injured: (1) the degree of control the employer-vessel owner had over the seaman at the time of injury; and (2) whether the seaman, at the time of injury, was on personal business or on a mission for the benefit of his employer or attending to the business of his employer. *851 Cal Dive does not contest in this assignment of error that it exercised the requisite degree of control.
Regarding the second element, in Aguilar v. Standard Oil Co. of N.J., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943), the Supreme Court recognized the distinction between "blue water" seamen and inland commuter seamen. Lee, 591 So.2d at 1375. The Lee court noted that, "with respect to `blue water' seamen, shore leave, with its attendant relaxation, is a necessary and beneficial antidote for the confinement and rigid discipline to which the seamen are subjected aboard ship by reason of the unique nature of their employment." Id. It is in the shipowner's best interest to ensure that the seamen shall enjoy these hours of relaxation. Id. The Aguilar court noted that a ship's responsibility "extends beyond injuries sustained because of, or while engaged in, activities required by his employment (emphasis added)," Aguilar, 318 U.S. at 732, 63 S.Ct. at 934, where a ship provides an employee's framework for existence. The Supreme Court further stated: "The sailor departing for or returning from shore leave is, sensibly, no more beyond the broad protection of his right to maintenance and cure than is the seaman quitting the ship on being discharged or boarding it on first reporting for duty."[5]Aguilar, 318 U.S. at 736, 63 S.Ct. at 936-937. The "in the service of the ship test" used to determine entitlement to maintenance and cure is equivalent to the Jones Act term "course of employment." Lee, 591 So.2d at 1373.
Here it is undisputed that the plaintiffs were living on board Cal Dive's ship, the M/V Witch Queen, and were on authorized shore leave. Duzon was in the course and scope of his employment and Paral was in the service of the ship by providing transportation to Duzon for authorized shore leave on a bicycle allowed on board for the very use for which it was being utilized. There was no legal error in attributing the fault of Paral to the shipowner. There was legal error in attributing the fault of Duzon to the shipowner. However, as discussed below, we find the jury erred in assigning any fault to Duzon.

DISPOSITION
Accordingly, we find merit in Cal Dive's assignments of error two, three and four and no merit to Cal Dive's fifth assignment of error.

WAL-MART'S SUMMARY JUDGMENT AND COMPARATIVE FAULT
A. FINALITY OF JUDGMENT
Wal-Mart argues that the appeal delays on the summary judgment entered in their favor have run and that Cal Dive's and Stallworth's appeals are untimely as to them. We disagree.
We note that the third-party demand against Wal-Mart was filed on December 28, 1999 and the original suit was filed on January 28, 1999. "Prior to its amendment by 1999 La. Acts, No. 1263, § 1, effective January 1, 2000, which is applicable to all actions filed on or after that date, Article 1915(B) provided that the granting of a partial judgment as to fewer than all the parties did not constitute a final judgment unless designated as such." Perry v. City of Bogalusa, 2000-2821, p. 3 n. 2 (La.App. 1 Cir. 12/28/01), 804 So.2d 895, 898 n. 2. Because this case *852 was filed before the effective date of the amendment and the judgment dismissing Wal-Mart was not designated as a final judgment, the appeal of summary judgment in favor of Wal-Mart is properly before us on appeal. This argument lacks merit.
B. ENTITLEMENT TO SUMMARY JUDGMENT
Cal Dive argues that it was entitled to file a third-party claim for indemnification and reimbursement against Wal-Mart under general maritime law. This appears to be a true statement of law. However, under Louisiana's Civil Code articles addressing comparative negligence, La. C.C. art. 2323 and La. C.C. art. 2324, Cal Dive is responsible only for its proportionate share of negligence. Here, there is no allegation of any intentional acts that would give rise to liability in solido. See La. C.C. art. 2324 A. Louisiana Civil Code art. 2324 B provides that if liability is not solidary pursuant to Sec. A, liability is joint and divisible:
A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
Since Cal Dive cannot be liable for more than its degree of fault, it cannot be held liable for any negligence attributable to Wal-Mart or any other party. Cal Dive is not entitled to the relief sought as a matter of law.
Further, Cal Dive and Stallworth failed to produce factual support sufficient to establish that either of them would be able to satisfy their burden at trial. The initial burden of proof on a motion for summary judgment is on the mover to show that no genuine issue of material fact exists. La. C.C.P. art. 966 C(2). However, once the mover has made a prima facie showing that the motion should be granted, if the non-movant bears the burden of proof at trial on the issue before the court, the burden shifts to that party to present evidence demonstrating that material factual issues remain. La. C.C.P. art. 966 C(2). Supporting and opposing affidavits are to be made on personal knowledge, shall set forth facts that would be admissible in evidence, and shall show that the affiant is competent to testify to the matters stated therein. La. C.C.P. art. 967. A document that is not an affidavit or sworn to in any way, or which is not certified or attached to an affidavit, is not of sufficient evidentiary quality on summary judgment to be given weight in determining whether or not there remain genuine issues of material fact. Robertson v. Northshore Regional Medical Center, 97-2068, pp. 5-6 (La.App. 1 Cir. 9/25/98), 723 So.2d 460, 464. Attachments to a memorandum are not properly before the court on a motion for summary judgment and should not be considered in resolving the motion. Robertson, 97-2068 at p. 6, 723 So.2d at 464.
Here, Wal-Mart made its prima facie case for summary judgment with its deposition excerpts filed into the record. Cal Dive, however, did not produce any affidavits or other factual support in opposition to Wal-Mart's motion for summary judgment. Stallworth filed into evidence several deposition excerpts and an unsigned, *853 unverified affidavit.[6] Nothing in the deposition excerpts, however, indicate that the bicycle at issue lacked a reflector at the time Wal-Mart sold it. The unsigned affidavit can be given no weight. Robertson, 97-2068 at pp. 5-6, 723 So.2d at 464.
Cal Dive and Stallworth, therefore, have failed to produce factual support to establish that they would be able to satisfy their burden of proof at trial. Accordingly, the trial court did not err in granting summary judgment in favor of Wal-Mart.

WAL-MART'S DEGREE OF FAULT
Even so, Cal Dive and Stallworth further argue that the trial court erred in not allowing evidence and in not instructing the jury to consider Wal-Mart's degree of negligence, if any, in this matter. We disagree.
Louisiana Civil Code art. 2323 A provides in pertinent part as follows:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. (Emphasis added.)
In Bowie v. Young, XXXX-XXXX, pp. 10-11 (La.App. 3 Cir. 3/20/02), 813 So.2d 562, 569-570, writ denied, XXXX-XXXX (La.6/21/02), 819 So.2d 335, however, the Third Circuit considered the application of La. C.C. art. 2323 where the trial court allocated fault to a party that had been previously dismissed on summary judgment, which is the circumstance before us. Wal-Mart has previously been released from this litigation by summary judgment, as discussed above.
In Bowie, the Third Circuit decided: "[w]hen the court determines that a party or nonparty is not negligent, he may not be considered in the allocation of fault, and subsequent evidence may not be admitted to establish his fault."[7]Bowie, XXXX-XXXX at p. 10, 813 So.2d at 570. The Third Circuit reasoned as follows:
Although the article is silent regarding dismissed, non-negligent Defendants, we believe that it is illogical to consider these parties in the allocation of fault when it has previously been determined that they did not cause or contribute to the injury as required by the article. Further, such a reading of the article would result in the possibility of penalizing the Plaintiff by forcing the allocation of fault to non-negligent previously dismissed parties thereby reducing her recovery. Such an application of the law would be absurd. The very nature of Louisiana tort law centers around the principle that every person is responsible for the damage he causes by his negligence. La.Civ.Code art. 2316. Conversely, one may logically deduce *854 that a non-negligent party is not responsible for damages that he does not cause.
Bowie, XXXX-XXXX at p. 10, 813 So.2d at 569-570.
We find the Third Circuit's reasoning persuasive and we conclude, as they did, that when the court determines that a party or nonparty is not negligent, he may not be considered in the allocation of fault, and subsequent evidence may not be admitted to establish his fault.
Accordingly, the trial court committed no error when it failed to allocate any percentage of fault to Wal-Mart pursuant to La. C.C. art. 2323.

BRUNSWICK'S DEGREE OF FAULT
Stallworth further argues that the trial court was manifestly erroneous in failing to include Brunswick Corporation, the bicycle manufacturer, on the jury verdict form for assessment of non-party liability under La. C.C. art. 2323. Stallworth argues that plaintiffs' expert in human factors, Mr. Andrew LeCocq, established Brunswick's fault in failing to adequately warn riders of the perils of driving at night. We disagree.
Pretermitting the issue of whether Mr. LeCocq's testimony constituted sufficient evidence of Brunswick's failure to warn,[8] Stallworth cites no evidence, and we can find none, showing how this failure to warn caused or contributed to the injury as required by La. C.C. art. 2323. Therefore, we conclude that the trial court committed no error in failing to include a jury interrogatory on the issue of Brunswick's percentage of fault.

EXCLUSION OF ALCOHOL TEST RESULTS
Cal Dive and Stallworth argue that the trial court abused its discretion in failing to admit test results allegedly showing that Paral (the deceased driver of the bicycle at issue) and Duzon (the surviving passenger riding on the handlebars) had been impaired by alcohol at the time of their accident.[9] The trial court excluded test results on Paral prepared by the Laboratory Corporation of America as part of the autopsy. The trial court also excluded test results on Duzon contained in hospital records from the Terrebonne General Medical Center. For the following reasons, we find the trial court committed no error. We address each test result separately.
A. GENERAL LEGAL PRECEPTS
Generally, a trial court is granted broad discretion in its evidentiary rulings, and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. Emery v. Owens-Corporation, 2000-2144, p. 6 (La.App. 1 Cir. 11/9/01), 813 So.2d 441, 448, writ denied, XXXX-XXXX (La.5/10/02), 815 So.2d 842. Also, a trial court is granted a broad discretion in assessing the probative value of evidence. City of Baton Rouge v. Tullier, 401 So.2d 422, 424 (La.App. 1 Cir.1981).
Regarding blood alcohol test results, there is no statutory presumption of intoxication in civil cases. However, evidence *855 of a blood alcohol reading has probative value and may be considered by the trier of fact when determining if the driver's abilities were impaired. Bullard v. State, Department of Transportation and Development, 98-1942, pp. 3-4 (La.App. 1 Cir. 11/5/99), 744 So.2d 212, 215.
Absent the medical records exception, parties seeking to admit blood alcohol test results are required to lay a proper foundation, which foundation relates not only to the chain of custody, but also to the integrity and reliability of the chemical test. Judd v. State, Department of Transportation and Development, 95-1052, p. 5 (La.11/27/95), 663 So.2d 690, 694. The medical records exception, however, obviates the need for laying a foundation for admissibility. Judd, 95-1052 at p. 6, 663 So.2d at 694. "The language of R.S. 13:3714 is clear that a certified copy of any hospital record shall be received in evidence as prima facie proof of its contents." Id. The court observed, "Courts and commentators alike generally consider medical records, including records reflecting a patient's [blood alcohol concentration] BAC, to be inherently reliable because medical personnel rely on the information in those records in making life and death decisions." Id.
Louisiana Code of Evidence art. 402 provides that all relevant evidence is admissible and that evidence that is not relevant is not admissible. Louisiana Code of Evidence art. 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
B. PARAL'S TEST RESULTS
The trial court disallowed the lab report prepared by the Laboratory Corporation of America because it was troubled by both the chain of custody and the reliability of the test.
At a hearing on a motion in limine, conducted during the trial to decide the admissibility of the blood alcohol test results, the trial court in oral reasons first addressed whether it should amend the pretrial order to allow evidence of a witness not on the witness list that would testify to the chain of custody of the test sample. In deciding to disallow the testimony of this witness, the trial court said the "critical thing" was that the witness could not tell the jury anything about "what they did and how the tests came about." The trial court was troubled that Mr. Paral might lose a substantial amount of money "based upon an anonymous, faceless person sitting somewhere in a laboratory in [another state], beyond the reach of cross-examination of [Mr. Paral's] counsel." The trial court then excluded the witness for not being in the pretrial order and excluded the report containing evidence of Mr. Paral's blood alcohol content because it was not properly identified and no one could tell what he or she did when conducting the test.
The trial court further found that the report containing the test result was confusing, containing many unexplained notations and numbers that could have been blood alcohol test results. The trial court then found that the report was so confusing as to be unreliable, and again ruled the test results inadmissible. The court also noted the lack of any presumption that Paral was impaired.
Cal Dive and Stallworth argue that the test results should have been admissible and that the defects in the chain of custody should have been factors in the weight the jury gave the evidence. They cite McLaughlin v. Fireman's Fund Ins. Co., *856 582 So.2d 203 (La.App. 1 Cir.1991) for the proposition that "[g]aps in a chain of custody usually affect the weight of the evidence, not its admissibility, and an unbroken chain of custody is not essential for the admissibility of the evidence as long as the foundation evidence as a whole shows it is more probable than not that the evidence tested was that which was originally taken." (Emphasis removed.) McLaughlin, 582 So.2d at 208. The Louisiana Supreme Court has ratified this principle in Arriola v. Orleans Parish School Board, XXXX-XXXX, p. 8 (La.2/26/02), 809 So.2d 932, 937.
In this regard, the trial court assumed at times that the chain of custody was adequate. The trial court discussed generally that the evidence was so lacking that it could not determine whether the sample was contaminated or what steps were taken to ensure the identity of the blood sample at issue. Even so, the court found fault with the evidence of the integrity and reliability of the testing procedures employed. The trial court discussed its concerns with the possibility of lack of sterilization and of contamination of the blood sample, with the identity and qualifications of the persons performing the several aspects of collecting and testing the blood, and the precautions employed to protect the integrity of the sample.
A proper foundation for admissibility of blood test results includes not only the chain of custody, but also the integrity and reliability of the chemical test. Judd, 95-1052 at p. 5, 663 So.2d at 694. The trial court did not abuse its discretion in refusing to amend its pretrial order to allow testimony from a previously unnamed witness appearing during the course of trial who could not testify to the steps and procedures employed to test the blood sample. The record contains minimal other evidence of the chain of custody or of the integrity and reliability of the test. Further, we have reviewed the test results and conclude the trial court did not abuse its discretion in finding the lab report confusing and unreliable.
We conclude the trial court did not abuse its discretion in concluding that the test results were unreliable. We further conclude the trial court did not abuse its discretion in excluding evidence of test results that it found unreliable. Accordingly, this assignment of error is without merit.
C. DUZON'S TEST RESULTS
The trial court excluded the blood alcohol test results contained in the hospital record of the Terrebonne General Medical Center, concluding that it was irrelevant. The trial court also stated that it employed a balancing test under La. C.E. art. 403 and concluded: "And I think that the alcohol content would be too devastating and the prejudicial effects would really outweigh the benefits in that."
Cal Dive and Stallworth argue, however, that the test results were admissible under the medical records exception, La. R.S. 13:3714, and that the trial court abused its discretion in excluding this evidence. They argue that the evidence of Duzon's blood alcohol level is relevant because he might have perceived the danger that caused his death and avoided the accident. They argue that alcohol use was evidence of willful misconduct that could defeat Duzon's claim for maintenance and cure, even though evidence in the record shows that crewmembers were instructed to drink in moderation. The record contains no evidence of immoderate drinking or of any gross or outrageous conduct. They argue that alcohol consumption might have made it more likely for Paral and Duzon to recklessly ride at night with Duzon riding on the handlebars, even though they left *857 the ship in this manner. They further argue that the test results were relevant to show whether Duzon knew or should have known of Mr. Paral's intoxication but still chose to ride on the handlebars.
Above, we concluded the trial court did not abuse its discretion in disallowing evidence of Paral's blood alcohol content. Without admissible evidence that Paral, the driver of the bicycle, was impaired by alcohol, we cannot say the trial court abused its discretion in finding irrelevant the blood alcohol evidence against Duzon or in finding that the prejudice would outweigh any probative value. While Cal Dive and Stallworth speculate about the effects of alcohol on Duzon, who was a passenger on the bicycle Paral was driving, the record fails to demonstrate that Duzon's consumption of alcohol caused or contributed to the accident.
While the test results showing Duzon's blood alcohol content are admissible under the medical records exception, the trial court's decision to exclude this evidence on the grounds of relevance and of prejudicial value outweighing probative value was within its broad discretion. This assignment of error is without merit.

REAR-END COLLISION NEGLIGENCE PRESUMPTION SUDDEN EMERGENCY DOCTRINE
The trial court instructed the jury that in a rear-end collision case, the burden shifts to the driver colliding with the vehicle in front to prove he or she was not negligent is causing the accident. The trial court premised this instruction on La. R.S. 32:194, which grants bicycle riders all the rights and subjects them to all duties applicable to drivers of vehicles. The statute excepts bicycles from "special regulations in this Part" and from "provisions of this Chapter" that "by their very nature can have no application." The trial court also declined to instruct the jury on the sudden emergency doctrine.
Stallworth asserts that the trial court erred in charging the jury as to the presumption of negligence and in failing to charge the jury regarding the sudden emergency doctrine. The only argument Stallworth puts forth in support of the inapplicability of the rear end collision presumption is that "by its very nature," the presumption has no applicability to automobile/bicycle collisions. We disagree.
While the circumstances of this accident are unusual and attributable, at least in some degree, to the condition of the bicycle and the non-reflective clothing worn by the plaintiffs, bicycles are ridden every day on the public streets and highways of this state. Louisiana Revised Statute 32:194 equates riders of bicycles with drivers of vehicles. Nothing in the nature of bicycles prevents the application of the presumption.
Even so, Stallworth argues that should the presumption apply, the trial court erred in failing to instruct the jury as requested that the presumption was rebuttable. Such instruction, however, is not required by law. Louisiana Code of Evidence art. 307, on which Stallworth relies, states as follows:
In jury cases, upon request, the jury shall be instructed of the existence of a presumption and instructed as to its effect in accordance with Articles 305 and 306.
The actual instruction Stallworth requested at trial was that the trial court instruct the jury that "this presumption may be overcome by mere inference to the contrary." Neither La. C.E. art. 305[10] nor *858 art. 306[11] require this instruction. Here, while the trial court instructed the jury on the existence of the presumption, it did not instruct the jury to find the inferred fact. It did, however, later instruct the jury to weigh the comparative fault of the parties.
Accordingly, the trial court did not abuse its discretion in failing to give the requested jury instruction on the issue of rebutting the presumption of negligence in rear-end collisions.
Stallworth next argues that the trial court erred in failing to give a jury instruction on the sudden emergency doctrine. The sudden emergency doctrine provides an exception to the general rule that a following motorist is presumed negligent if he collides with the rear of a leading vehicle. The sudden emergency doctrine was developed when contributory negligence was a complete bar to recovery. It is suggested that the sudden emergency doctrine be discarded now that comparative fault applies and there is no longer any logical basis for the application of the doctrine. Our courts continue to apply the doctrine, however. When a following motorist is suddenly confronted with an unanticipated hazard created by a forward vehicle, which could not be reasonably avoided, the following driver will be adjudged free from fault. Armstrong v. Fireman's Fund Ins. Co., 558 So.2d 646, 648 (La.App. 1 Cir.1990). It is the unanticipated hazard that is the foundation for invoking the sudden emergency doctrine. Id.
Here, in deciding to exclude instruction on the sudden emergency doctrine, the trial court recounted uncontradicted testimony that a bicycle on the road in Lafourche Parish was not unanticipated. He concluded that the facts adduced at trial would not support such an instruction. Rather, the trial court suggested that had the Stallworth truck had its high beams on, there would have been no hazard. We also note that the trial court's instructions on the elements of negligence and on apportionment of fault correctly instructed the jury regarding causation and the duties of the several parties here involved.
It is well established in Louisiana jurisprudence that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Nicholas v. Allstate Ins. Co., 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023. "The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions and it is well accepted that a trial court judgment will not be reversed so long as the charge correctly states the substance of the law." Id. When assessing an alleged erroneous jury instruction, it is the duty of the reviewing court to evaluate such impropriety in light of the entire jury charge to determine if it adequately provides the correct principles of law as applied to the issues and whether they adequately guided the jury in its deliberation. Id. "Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." Id.
*859 The jury instructions given by the trial court adequately provided correct principles of law as to the rights and duties of the parties to guide the jury in its deliberation. The jury was not misled when the trial court failed to give an instruction on the sudden emergency doctrine. Accordingly, this assignment of error is without merit.

STALLWORTH'S DUTY AS A NIGHT DRIVER
Mabile v. Thibaut Farms, 244 So.2d 66, 69 (La.App. 1 Cir.1971), restated the law regarding the duty of a driver at night as follows:
The rule is well established that one who operates a motor vehicle on public highways has a never ceasing duty to keep a sharp lookout ahead. A motorist is therefore held to have seen that which in the exercise of ordinary care he should have seen. Thus, though as a general rule a motorist may assume that the road ahead is safe for travel, he must when traveling after darkness or in circumstances of limited or impaired visibility observe and so control his vehicle as to avoid discernable objects in his path of travel; that is, in adverse conditions a greater degree of care must be exercised. This last rule however is subject to the well established exception that a night driver is not charged with the duty of guarding against unusual or unexpected obstructions which he had no reason to anticipate he would encounter on the highway and which under the circumstances are difficult to discover. (Citations omitted.)
Further, in Bordelon v. State Through Dept. of Highways, 253 So.2d 677, 678 (La.App. 1 Cir.1971), this court stated that "a motorist driving on a high speed highway at night is not as a matter of law required to see an unlighted and unexpected object in his path in time to come to a safe stop."
Stallworth argues that under this jurisprudence, it had no duty as a matter of law to see a slow-moving, unlit bicycle lacking a rear reflector. We pretermit the issue of whether Stallworth had a duty to see the bicycle at issue under the unique facts of this case because the evidence in the record shows that Mr. Stallworth did see the bike just beyond the glow of his headlights and did nothing other than take his foot off the accelerator. He himself acknowledges that he saw something just beyond his headlights, and he did not turn on his high beams, honk his horn or promptly slow down. He also acknowledged that there was no oncoming traffic and that he was driving with his low beams on. If he did see something ahead of him, it is of little moment whether or not the duty to see existed.
This assignment of error lacks merit.

PREJUDICIAL REMARK TO JURY

MOTION TO STRIKE
Before considering this assignment of error, we must decide on the merits of Duzon's motion to strike. For the following reasons, we grant Duzon's motion and order that the materials contained in pages 4429 through 4435 of the record be stricken and removed from the record.
The material added to the record includes three affidavits from attorneys for Stallworth and a judgment on costs. The affidavits assert that after Duzon's attorney stated during closing arguments that Duzon would die if the jury did not award him money, the attorneys asked the trial court to give a precautionary instruction. The affidavits further allege that the trial court declined to grant such instruction on grounds that the remarks of Duzon's counsel *860 were true. This exchange is not in the trial transcript. In their brief in opposition to the motion to strike, Stallworth acknowledges that Duzon's attorneys claim no recollection of this exchange.
Stallworth, however, provides no law supporting its position that their ex parte affidavits can cure the alleged defects in the transcript, nor can we find any. We conclude that an order allowing the submission of ex parte affidavits does not substitute for alleged omissions in a transcript.
Louisiana Code of Civil Procedure art. 2132 provides several options for correcting material parts of the trial record. We note that Stallworth could have sought to supplement the record under La. C.C.P. art. 2132 by stipulation or by appropriate proceeding in the trial court. Cookmeyer v. Cookmeyer, 244 So.2d 78, 79 (La.App. 4 Cir.1970). Stallworth, however, has not asked for a hearing from the trial court or for a stay or remand from this court for such hearing. Rather, they argue that the affidavits submitted are sufficient and assert that a contradictory hearing is unnecessary. Accordingly, we decide, based on the record and information properly before us, to exclude the material added to the record as stated above.
As to the judgment on costs supplemented into the record, we note that this judgment is the subject of another appeal in this court and should not be contained in this record. We therefore strike it from the record before us.

PREJUDICIAL REMARK TO THE JURY
Since the record before us does not reflect that either Cal Dive or Stallworth properly objected to the alleged inflammatory statement, the matter has not been preserved for appeal. We therefore find Cal Dive's assignment of error to be without merit. See La. C.C.P. art. 1793 C.

EFFECT OF LEGAL ERROR
The trial court committed legal error by instructing the jury concerning negligence per se and by reforming the verdict to attribute all of plaintiffs' negligence to defendant Cal Dive. What is the effect of this legal error?
In Gonzales v. Xerox Corp., 320 So.2d 163, 165 (La.1975), the Louisiana Supreme Court stated that a case should be reversed, "when the trial court has made a consequential but erroneous ruling on the exclusion or admission of evidence." "Consequential but erroneous" has been repeated since the ruling in Gonzales despite the fact that it should read "erroneous and consequential" since a ruling must first be determined to be in error and then the error must be consequential, despite the fact that all of the cases cited for this proposition use the traditional term "prejudicial error," except for Builliard v. New Orleans Terminal Co., 185 La. 924, 171 So. 78 (1936) which cites no standard. The only cases referring to "consequential errors" prior to Gonzales do so without citation. See e.g., Succession of Hewitt, 107 La. 446, 31 So. 859 (1902), which refers to "inconsequential consequential errors." It appears that the use of "consequential but erroneous" was simply an error and it is recommended that it be discontinued. The correct standard for determining the effect of legal error in a civil case should be the traditional harmless or prejudicial error standard used in the cases cited in Gonzales. This standard was applied in Buckbee v. United Gas Pipe Line Co., Inc., 561 So.2d 76, 85 (La.1990) and stated as follows:
Error has been defined as harmless when it is "trivial, formal, merely academic, and not prejudicial to the substantial *861 rights of the party assigning it, and where it in no way affects the final outcome of the case." 5 Am.Jur.2d, Appeal and Error § 776 (1962) (citing State v. Britton, 27 Wash.2d 336, 341, 178 P.2d 341, 344 (1947)); Eastburn v. Ford Motor Co., 471 F.2d 21, 22-23 (5 Cir.1972) (applying Florida law). By contrast, prejudicial error "affects the final result of the case and works adversely to a substantial right of the party assigning it." 5 Am.Jur.2d, Appeal and Error § 776 (1962); see also 5A C.J.S. § 1676 (1958). Moreover, error is prejudicial when it consists of the exclusion of evidence related to a "material point in issue" and adversely affects the substantial rights of the party opposed to the exclusion. 5 Am.Jur.2d, Appeal and Error § 776 (1962).
There have been variations such as, "where ... legal errors interdict the fact-finding process." See Evans v. Lungrin, 97-0541, pp. 6-7 (La.2/6/98), 708 So.2d 731, 735. Lungrin, however, repeats the traditional prejudicial error analysis, making "interdiction of fact-finding" superfluous:
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. (Citations omitted.)
Lungrin, 97-0541 at p. 7, 708 So.2d at 735.
It is suggested that a paraphrase of the harmless/prejudicial analysis used in Neumeyer v. Terral, 478 So.2d 1281, 1285[12] (La.App. 5 Cir.1985), be uniformly adopted as follows:
In determining the effect of legal error, the party alleging error has the burden of showing the error was prejudicial to his case. Error is prejudicial when the error is material and, when compared to the record in its totality, has a substantial effect on the outcome of the case. Prejudicial error is reversible error. Error that is not prejudicial is harmless error and is not reversible error.
Although the jury found a violation of a safety statute this finding did not have an effect on the outcome of the case. The legal error committed by the trial court in applying negligence per se only became prejudicial when the trial court reformed the jury verdict. Because we find that the trial court erred in its judgment by reallocating fault based on its error of law, we reinstate the jury's assessment of fault but attribute the fault of Paral to Cal Dive in regard to Duzon's claim. Paral is responsible for his own comparative negligence. Hurst v. Drusilla Seafood of Hammond, 616 So.2d 749, 752 (La.App. 1 Cir.1993). We now independently determine whether the factual findings of the jury in its allocation of fault were manifestly erroneous.

ALLOCATION OF FAULT
Cal Dive and Stallworth allege that the jury erred in its allocation of fault to them. We discuss each in turn.
A. GENERAL LEGAL PRINCIPLES
Appellate courts may not disturb the conclusions reached by a jury regarding factual matters in the absence of "manifest error." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). And, where two permissible views of the evidence exist, *862 the trier of fact's choice between them cannot be manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 883 (La.1993). Further, as with other factual determinations, a trier of fact is vested with much discretion in its allocation of fault. Clement v. Frey, 95-1119, pp. 5-6 (La.1/16/96), 666 So.2d 607, 609, 610. A trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Pelican Point Operations, L.L.C. v. Carroll Childers Co., 2000-2770, p. 8 (La.App. 1 Cir. 2/15/02), 807 So.2d 1171, 1176. Therefore, an appellate court should only disturb a jury's allocation of fault when it is manifestly erroneous. Duncan v. Kansas City Southern Railway Co., XXXX-XXXX, pp. 10-11 (La.10/30/00), 773 So.2d 670, 680. Appellate courts determine whether a trial court was manifestly erroneous in its allocation of fault under the factors set forth in Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 974 (La.1985). In Watson, the Supreme Court said various factors may influence the degree of fault assigned, including:
(1)[W]hether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Watson, 469 So.2d at 974. These same factors guide an appellate court's determination as to the highest or lowest percentage of fault that could reasonably be assessed. Clement, 95-1119 at pp. 7-8, 666 So.2d at 611.
B. CAL DIVE'S FAULT
Cal Dive argues that it had no fault in causing the accident at issue. Cal Dive also argues that the jury was erroneous in allocating to it 10% fault.
We have discussed above a ship's officers' duty to their crewmembers and the extent of their negligence. Considering the Watson factors, we cannot conclude that the jury's allocation of a minimal 10% fault was manifestly erroneous.
This assignment of error is without merit.
C. STALLWORTH'S FAULT
Stallworth argues that Duzon's and Paral's fault was much greater than theirs. Accordingly, they argue that apportioning 40% of fault to them is clearly wrong when Duzon and Paral's collective fault was allocated at 50%. In the case before us there were clearly two views of the evidence: one where Mr. Stallworth was driving along carefully when he came upon a nearly invisible Duzon and Paral; another where Mr. Stallworth was inattentive and did not see in time what he should have seen. The jury apparently believed the latter. And evidence in the record supports a finding that Mr. Stallworth's negligence was a substantial factor in causing the accident. Mr. Stallworth's own testimony was that he saw something beyond the glow of his headlights and he did not promptly respond. He did not turn on his high beams. He did not honk his horn, he did not slow down promptly. Experts gave testimony that Mr. Stallworth should have seen at least the pedal reflectors of the bicycle from a considerable distance away, even if the driver was wearing work *863 boots. Police officers testified that it was not uncommon for bicycles to be riding that stretch of road.
We review Stallworth's fault applying the Watson factors. The jury apparently concluded that Stallworth was aware of the danger in time to avoid or ameliorate the damage. The risk of death or serious injury was high. No purpose has been argued for Stallworth's conduct. At the moment Mr. Stallworth first saw the object just beyond his headlights, he apparently had the superior opportunity to avoid the accident. As extenuating factors, however, we note that the bicycle may not have had a rear reflector, that the pedal reflectors may have been partially covered, that Duzon and Paral were wearing dark clothes with minimal, if any, reflectivity, and that the time span involved was at best a few seconds.
Under these factors, we cannot say the jury was manifestly erroneous in allocating 40% of the fault for the accident to Stallworth or in finding that Paral was 25% at fault.
This assignment of error lacks merit.
D. DUZON'S FAULT
The jury found Duzon, the passenger on the bicycle, 25% at fault. There is no evidence of any fault on the part of Duzon which caused the accident. Sitting on bicycle handlebars could be negligent if the rider caused the bicycle to swerve or lose balance. There is no evidence that Duzon caused Paral to swerve or lose balance. If the driver of an automobile negligently swerves, enters the oncoming lane, runs a stop sign or runs off the road, our law does not attribute negligence to the guest passenger for not correcting the driver. There is no factual or legal basis here for a finding of fault on the part of Duzon. The jury was therefore manifestly erroneous in finding fault on the part of Duzon. Because Stallworth saw the bicycle and took no action to prevent the accident once he saw the cyclists, as discussed above, we attribute the fault the jury assigned to Duzon to Stallworth.

DAMAGE AWARD
Cal Dive assigns as error only that the damage award is excessive, without pointing to any particular award it challenges. In brief, however, it argues that the damage award should not be disturbed. We therefore consider this assignment of error abandoned. Stallworth does not appeal the amount of damages. We consider Paral's parents' and Duzon's assignments or error concerning the damage award.[13]
A. GENERAL LEGAL PRECEPTS
The Louisiana Supreme Court summarized the law regarding the appropriateness of an award for general damages in Duncan, XXXX-XXXX at pp. 13-14, 733 So.2d at 682-683, as follows:
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." Vast discretion is accorded the trier of fact in fixing general damage awards. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers *864 to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. As we explained in Youn:[14]
Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. (Citations omitted.)
In Youn, 623 So.2d at 1261 the Supreme Court employed the following standard in concluding that an award was not excessively high: "[w]e cannot conclude from the entirety of the evidence in this record, viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those `exceptional cases where such awards are so gross as to be contrary to right reason.'" (Citation omitted.)
B. PARAL'S DAMAGES
Paral's parents briefed only their claim that the general damage award for the wrongful death of their son was too low. On the jury verdict sheet, the jury was asked to determine "Damages to Mr. and Mrs. Paral for the wrongful death of their son[.]" The jury awarded $150,000. Paral's parents now argue that this sum is abusively low. They argue that the least appropriate award should be $150,000 per parent. We agree.
Under the standard outlined in Duncan, above, we conclude that no reasonable trier of fact could assess the effects of this wrongful death to Paral's parents under the particular circumstances of this case at $75,000 per parent. Paral was 26 years old when he died. He came from a small Philippine village and had always lived with his parents. He stayed with them when he was home, where he spent his vacations. He delivered to his parents the majority of his salary to assist his parents in paying for renovations to their home and to help pay for schooling for his sisters. Under these circumstances, we conclude the award is abusively low and contrary to right reason.
Accordingly, we look to pertinent jurisprudence to determine the lowest point that would be within the jury's discretion. Duncan, XXXX-XXXX at p. 14, 773 So.2d at 683. After careful review, we conclude that an award of $300,000, or $150,000 per parent, is the lowest award reasonably within the jury's discretion for Paral's wrongful death. We amend the judgment accordingly.
DUZON'S DAMAGES
1) General Damages
Duzon also argues that the jury's general damage award, totaling $625,000 was too low. We agree and conclude that no reasonable trier of fact could assess the effects of Duzon's brain damage, inability to walk, inability to ingest food but by gastric tube, muscle rigidity and spasticity, *865 incontinence, daily therapy and need for future surgery under the particular circumstances of this case at $625,000. Under these circumstances, we conclude the award is abusively low and contrary to right reason.
Accordingly, we look to pertinent jurisprudence to determine the lowest point that would be within the jury's discretion. Duncan, XXXX-XXXX at p. 14, 733 So.2d at 683. Of particular interest to our evaluation is Poche v. State, Through Department of Transportation and Development, 93-0369, p. 7 (La.App. 1 Cir. 3/11/94), 633 So.2d 913, 917, where this court concluded the following regarding the plaintiff's general damages:
As to general damages, Mr. Poche suffered a crushed vertebrae at the eighth thoracic level and is paralysed from the rib cage down and will be so for the rest of his life. The court need not recite in detail the total and complete change in lifestyle which accompanies such an injury. Suffice it to say, we are convinced that $3,000,000.00 is the lowest reasonable amount to compensate Mr. Poche in general damages.
Here, Duzon's damages are more extensive than Mr. Poche's and it is now eight years later. Nonetheless, we conclude that an overall award for general damages of $3,000,000 is the lowest award reasonably within the jury's discretion for Duzon's past and future pain and suffering, past and future mental anguish, distress, loss of enjoyment of life, permanent disability and disfigurement. We amend the judgment accordingly.
Special Damages
Special damages are those which either must be specially pled or have a ready market value, that is, the amount of the damages supposedly can be determined with relative certainty. Wainwright v. Fontenot, XXXX-XXXX, p. 5 (La.10/17/00), 774 So.2d 70, 74. Here, Duzon argues three alleged abuses of discretion in the jury's award of special damages. We discuss these below.
a) Past Lost Wages and Past Found
An award for past lost wages, including found, which is susceptible of mathematical calculation from documentary proof is not subject to the much discretion rule. See Eddy v. Litton, 586 So.2d 670, 675 (La.App. 2 Cir.1991). Here the jury awarded $10,000 for Duzon's lost wages, including loss of found. Duzon's expert, however, calculated the amount of lost wages to be $19,956 and the defendants' expert calculated the amount to be $18,213. The defense expert, Dr. Kenneth Boudreaux, testified that the difference in calculation might be due to use of a slightly different work-life table. Both testified to the mathematical models employed to arrive at their determined amounts.
Nonetheless, we adjust the award to the lowest reasonable amount the jury could have awarded, $18,213.
b) Past Medical Expenses
The parties stipulated that past medical expenses were $701,781.02. The jury awarded $700,000, apparently rounding off the stipulated figure. We see no basis in the record for the jury to exclude the $1,782.02 from the past medical expense award. We, therefore, conclude the jury abused its discretion in failing to award the full $701,781.02. We adjust the award to reflect this amount.
c) Future Medical Expenses
Duzon claims that the $2,300,000 awarded by the jury for future medical expenses and the cost of care attributable to his injuries is unjustifiable and that the proper award should be the figure proposed *866 by his expert: $2,818,760. The defendants' expert, Dr. Boudreaux, testified, however, that the proper award should have been $2,111,400. Dr. Boudreaux explained that their calculation would have been the same had they both employed the same discount rate. Dr. Boudreaux assumed a 3.8% discount rate while Duzon's expert, Dr. Randolph Rice, assumed a 3.0% discount rate.
We conclude that the jury did not abuse its vast discretion in awarding a sum in between that of the two experts. Future medical expenses by their nature are incapable of precise measurement. Thus, much discretion shall be left to the trier of fact for the reasonable assessment of those damages. Knabel v. Lewis, XXXX-XXXX, p. 4 (La.App. 1 Cir. 9/28/01), 809 So.2d 314, 317. See also La. C.C. art. 1999. The record reflects that the experts employed accepted methods in the field of economics in making their determination of future medical expenses and that their results were consistent but for the different discount rates each assumed.
We find no merit in Duzon's argument that the award for future medical expenses was abusively low.

OTHER ISSUES RAISED ON ANSWER TO APPEAL
Duzon and Paral's parents raise several issues by answer to appeal that have been addressed above. Duzon asks that the judgment be modified to apply Paral's fault to his employer, Cal Dive. We agree. Duzon asks that this court cast the defendants for costs in the trial court. This issue is being considered by separate appeal and is not properly before us. Accordingly, we do not consider Duzon's sixth assignment of error. Duzon's fifth assignment of error asks that the amended judgment be affirmed. This is not an assignment of error susceptible to review.
Paral's parents also ask that the allocation of fault to him and Duzon be reversed or ascribed to their employer, Cal Dive. We have addressed this issue above. They also ask this court to condemn the defendants for costs in the trial court. Again, this issue is being considered by separate appeal and is not properly before us. Accordingly, we do not consider Paral's parents' second and fourth assignments of error. Their third assignment of error asks that the amended judgment be affirmed. This is not an assignment of error susceptible to review.

DECREE
We amend the judgment of the trial court in these respects: 1) the general damage award to Paral's parents is increased to a sum of $300,000; 2) the overall general damage award to Duzon is increased to $3,000,000; 3) the award for Duzon's past wages, including found, is increased to $18,213; and 4) the award for Duzon's past medical expenses is increased to $701,781.02. As to Paral, fault is allocated 10% to Cal Dive, 65% to Stallworth, and 25% to Paral. As to Duzon, the fault of Paral is allocated to Cal Dive so that Cal Dive is allocated 35% of the fault. Duzon's fault is allocated to Stallworth making Stallworth 65% at fault. Costs of this appeal are allocated two-thirds to Stallworth and one-third to Cal Dive.
AFFIRMED IN PART, AMENDED IN PART AND RENDERED.
WHIPPLE, J., concurs.

ON APPLICATIONS FOR REHEARING
PER CURIAM.
The application for rehearing filed by Thomas L. Stallworth, Queen Bee Transport, *867 Inc. and Venture Transport, Inc. on December 27, 2002 is denied as untimely. The document styled "Application for Rehearing on Behalf of Defendant-Appellants, Thomas L. Stallworth, Queen Bee Transport, Inc., and Venture Transport, Inc." filed on January 3, 2003 is, in our view, a memorandum in support of the earlier December 27, 2002 application for rehearing. However, to the extent that the January 3, 2003 filing is offered as an application for rehearing, it is also denied as untimely.
Cal-Dive's application for rehearing timely filed on December 26, 2002, is also denied.
NOTES
[1] The Honorable Michael A. Patterson, Judge, First Circuit Court of Appeal, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] 46 App.U.S.C. § 688. The Jones Act allows an injured seaman to bring a negligence action against his employer. Further, "[a]n injured seaman is allowed to join a claim for unseaworthiness, for maintenance, cure and wages, with a Jones Act suit. Seamen are allowed to bring their Jones Act claims in state court pursuant to the `saving to suitor' clause of the Judiciary Act of 1789. In matters involving admiralty and maritime jurisdiction, the saving to suitor clause permits state courts to have concurrent jurisdiction with the federal district courts." (Citations omitted.) Foster v. Destin Trading Corp., 96-0803, p. 4 (La.5/30/97), 700 So.2d 199, 202. Here, the jury found that the M/V Witch Queen was not unseaworthy. This finding has not been appealed.
[3] The Jones Act, 46 App. U.S.C. § 688(a), states, "all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply[.]"
[4] The record reflects that the Cal Dive Ship, the M/V Witch Queen, was flagged as a Bahamian ship and that the Bahamas are a signatory to the STCW.
[5] In Aguilar, the Supreme Court noted but did not consider that "gross" fault could defeat a shipowner's duty to protect his employees. Aguilar, 318 U.S. at 734, 63 S.Ct. at 936. No allegations exist in the record before us of gross negligence or intentional tort. We, therefore, do not consider this exception.
[6] The record reflects that Stallworth filed a motion to substitute affidavit seven days after the trial court signed the judgment granting summary judgment in favor of Wal-Mart. A signed and authenticated affidavit was attached to the motion. The trial court denied the motion.
[7] The Third Circuit also ruled that the summary judgment, which was a final judgment, was the law of the case. Bowie, XXXX-XXXX at p. 8, 813 So.2d at 568. The summary judgment at issue in Bowie had been upheld on appeal and had become final. We do not consider applicability of law of the case doctrine in the matter before us.
[8] Mr. LeCocq testified that the warning on the bicycle at issue was defective because it was small, contained no signal word such as "Danger," "Warning" or "Caution," and failed to describe the consequence for not abiding by the precautions (which were the only contents of the warning label). He also testified that graphics are common and valuable to draw users' attention to the warning. No graphics were on the warning label at issue.
[9] Paral's blood alcohol tested at .097 BAC. Duzon's blood tested at .060 BAC. (Proffered evidence.)
[10] Art. 305. Effect of presumptions if there is no controverting evidence

If the trier of fact finds the existence of the predicate fact, and there is no evidence controverting the fact to be inferred, the trier of fact is required to find the existence of the fact to be inferred.
[11] Art. 306. Effect of presumptions if there is controverting evidence

If the trier of fact finds the existence of the predicate fact, and if there is evidence controverting the fact to be inferred, it shall find the existence of the inferred fact unless it is persuaded by the controverting evidence of the nonexistence of the inferred fact.
[12] "[T]he party alleging error has the burden of showing the error was prejudicial to his case. In other words, the determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case." (Citations omitted.) Neumeyer v. Terral, 478 So.2d at 1285.
[13] Duzon also assigned as error that future wages, including past and future found should be increased from $90,000.00 to $184,736.73, but did not brief the issue. Accordingly, we also consider this assignment of error abandoned.
[14] Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).